### Jose O. CASTELLON, Appellant,

v.

### UNITED STATES, Appellee.

### No. 02–CF–276.

District of Columbia Court of Appeals.

Argued Feb. 5, 2004.

Decided Dec. 30, 2004.

Paul Y. Kiyonaga, Washington, appointed by the court, for appellant.

Donnell W. Turner, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, and Pamela S. Satterfield, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FERREN and STEADMAN *, Senior Judges.

WAGNER, Chief Judge:

Following a jury trial, appellant, Jose Castellon, was convicted of first-degree sexual abuse while armed (D.C.Code §§ 22–4102, –3202) (1996) [1] and possession of a firearm during the commission of a crime of violence ("PFCV") (D.C.Code § 22–3204(b) (1996)).[2] He argues for reversal on the grounds that the trial court erred: (1) in denying his motions to suppress evidence and statements obtained without his voluntary consent and in violation of his rights under the Interpreter Act, D.C.Code § 31–2702 (1998) [3] (the Act); and (2) in excusing a subpoenaed witness in violation of his Constitutional rights under the Sixth Amendment. We affirm.

## I.

### FACTUAL SUMMARY

#### A. *Suppression Hearing*

Officer Darrell Roberts testified that at approximately 9:30 a.m. on May 8, 2000, he went to the 1400 block of Spring Road, N.W. to investigate a report of sexual as-

sault. After talking with other officers at the scene, he spoke with the complaining witness, M.D. M.D. reported that a man had assaulted her sexually earlier that morning, at gunpoint, in an apartment. Officer Roberts testified that M.D. described her assailant as a Hispanic male, approximately 5'7" tall, skinny, light complexioned, with a tattoo and a gold bridge on his teeth. Officer Roberts said that she also described the car that the man was driving as a gray four-door Camry, which the officer spotted parked directly in front of 1443 Spring Road, and M.D. said that she thought that was the building where she was assaulted. She later confirmed this when she recognized a dumpster in the rear of the building, which she had seen earlier from a window while inside the building. M.D. went inside the building with the officer where she identified apartment 103 as the unit where she was assaulted. The officer knocked on the door to the apartment, heard movements inside, but no one responded. Officer Roberts testified that they went back outside because he planned to obtain a search warrant and to send M.D., who was complaining of abdominal pain, to the hospital.

About that time, M.D. spotted a man coming out of 1443 Spring Road, whom she said was the man who had put her out of the apartment building. The police spoke to the man, who identified himself as Hilario Ventura and gave his address as 1443 Spring Road, apartment 103. Mr. Ventura said that he had a brother-in-law named Jose Castellon. The police explained to Mr. Ventura that his brother-in-law might

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

1. Recodified at D.C.Code §§ 22–3002, –4502 (2004).

2. Recodified at D.C.Code § 22–4504(b) (2004).

3. Recodified at D.C.Code § 2–1902 (2004).

be involved in the assault they were investigating, and they requested his consent to search his apartment. After receiving an explanation of the Consent to Search form, Mr. Ventura, who spoke English and said that he understood it, signed the form giving the police his consent to search his apartment.

Mr. Ventura then took the officers inside his apartment and pointed out Castellon's bedroom door. The police knocked on the door, and Castellon, who matched M.D.'s description of the man who assaulted her, answered the door. Officer Roberts testified that he attempted to communicate with Castellon, but Castellon conveyed by word and gesture that he did not speak English very well. Officer Roberts then called for a Spanish-speaking officer, for whom they had to wait about fifteen or twenty minutes. While they were waiting, Officer Roberts motioned to Castellon not to return to the bedroom, and Castellon, who was not handcuffed or restrained, sat in the living room area and also went into the dining room area while waiting.

Officer Yamit Chaparro, who responded to Officer Roberts' request, testified that he was born in Puerto Rico and that Spanish is his native language. He testified that he communicated with Castellon in Spanish and that they had no difficulty understanding each other. He said that he told Castellon not to go into the bedroom for the safety of everyone because they thought he had a weapon in there. Officer Chaparro testified that he explained to Castellon "what was going on," that his room "needed" to be searched and that they "needed his consent and [they] were going to give him a form to sign."

Officer Chaparro also testified that he told Castellon that he had the right to refuse the search. He testified that he translated the Consent to Search form into Spanish and that Castellon appeared to have no difficulty understanding it and asked no questions about it. When Officer Chaparro asked Castellon if he understood what he had read to him, Castellon said that he understood. Castellon then signed the Consent to Search form. After Castellon executed the form, Officer Roberts and another officer searched the apartment.[4] The police recovered from Castellon's room a silver and black air pistol.

Thereafter, Officer Chaparro informed Castellon that he was under arrest for sexual assault and transported him to the police station for questioning. Approximately sixty minutes passed between the time they arrived at the station and the commencement of the interview with Castellon. Prior to the interview, Officer Chaparro read Castellon his *Miranda*[5] rights in Spanish, and Castellon initialed and executed a form waiving those rights. Officer Roberts then asked Castellon questions which Officer Chaparro translated. At this point, Castellon made an incriminating statement. The interview lasted approximately twenty to twenty-five minutes. Officer Chaparro testified that during the interview, one of Castellon's hands was handcuffed, but otherwise, he was unrestrained. He also testified that Castellon was not ill, injured, or under the influence of drugs or alcohol.

The trial court ruled that Castellon voluntarily consented to the search, having found that Officer Chaparro had translated the Consent to Search form to Castellon

---

4. The record is not clear concerning how many officers were present when Castellon executed the Consent to Search form. However, there is evidence that in addition to Officer Chaparro and Officer Roberts, a third officer was present who witnessed Castellon's signature on the form.

5. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and informed him that he did not have to agree to the search. The trial court rejected Castellon's argument that his consent was obtained in violation of the Interpreter Act, since Officer Chaparro had no difficulty communicating with Castellon in Spanish. The court explained further that "to the degree that there was a violation of the Interpreter[ ] Act, it was a technical violation that did not affect any substantive right."

The government conceded that the police did not comply with the Interpreter Act in obtaining Castellon's statement at the police station, and therefore, the trial court ruled that the statement could not be used in the government's case in chief. However, the court found that Castellon gave a knowing and voluntary waiver of his *Miranda* rights, and therefore held that the statement could be used in rebuttal.

### B. *The Trial*

Given the issues raised on appeal, we need recount only briefly the evidence at trial. According to the testimony of the complainant, M.D., she was walking home from a friend's house at about 3:00 a.m. on May 8, 2000, when it started to rain, and she stopped under some trees and looked around for a cab. A man she later identified as Castellon drove by and offered her a ride. Although she declined the offer, she said that the men in the car pursued her. Leaving the door open, a male passenger got out of the car, and urged her to get in.[6] The complainant said that the passenger pointed out a building where he lived, and invited her in. M.D. described her efforts to "ease" away from the men, but they continued to follow. As a part of

her escape plan, M.D. said she made an effort to close the door of the vehicle, but the driver pulled her into the car and slammed the door, leaving his passenger on the street. She testified that the driver locked the automatic door locks, and he reached under the seat where she saw a black object that she thought might be a gun. She testified that Castellon groped at her breast and between her legs while she was in the car. M.D. testified that subsequently, Castellon led her inside an apartment and forced her into his room, which he opened with a key. She described how Castellon forcibly penetrated her vaginally before anally sodomizing her at gunpoint. She stated that she tried to bang her head on the wall during the assault to alert someone. Castellon fell asleep eventually, and she collected her belongings, except for her pants, which Castellon had placed under his pillow, and she left the room. When she entered the hallway, she saw a small Hispanic child, who led her to another part of the apartment and gave her some shorts to wear. M.D. called the 911 number for the police. The police came and located Castellon in the apartment building which M.D. pointed out, and they found an air pistol inside his bedroom. DNA testing results showed that sperm found in M.D.'s anal and vaginal areas came from Castellon. Castellon was convicted of first-degree sexual abuse while armed (anal penetration) and PFCV.[7]

### II.

### SUPPRESSION ISSUES

Castellon argues that the trial court erred in denying his motion to suppress

---

6. She testified that the man re-entered the car at some point, and after an animated discussion with Castellon, returned to the street and told her that Castellon was crazy.

7. The jury acquitted him of first-degree sexual abuse (vaginal penetration) (D.C.Code § 22–4102 (1996)).

tangible evidence because (1) the police obtained his consent in violation of the Interpreter Act, and (2) the government failed to meet its burden of establishing that he voluntarily consented to the search leading to discovery of the weapon. In response, the government argues that the record supports the trial court's determination that Castellon freely and voluntarily consented to the search and that the Interpreter Act is irrelevant to the validity of his consent because Castellon was not in police custody nor subject to police interrogation at the time he consented.

This court's review of a motion to suppress is "limited." *Gatlin v. United States*, 833 A.2d 995, 1005 (D.C.2003) (citing *(Dexter)Davis v. United States*, 781 A.2d 729, 734 (D.C.2001)) (other citation omitted). " 'We view the evidence in the light most favorable to the prevailing party, and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling.' " *Id.* (quoting *(Dexter) Davis*, 781 A.2d at 734). While we give deference to the trial court's findings of fact, we review its legal conclusions *de novo*. *Lyons v. United States*, 833 A.2d 481, 485 (D.C.2003) (citing *Maddox v. United States*, 745 A.2d 284, 289 (D.C. 2000)). Applying that standard, we find no basis for disturbing the trial court's ruling.

A. *Challenge Under the Interpreter Act*

We consider first Castellon's argument that his consent to the search was obtained in violation of the Interpreter Act. Specifically, he contends that assuming that he voluntarily consented to the search, the air pistol and any other evidence seized during the search must be suppressed because his consent was obtained through an interpreter who was not qualified within the meaning of the Act. The section of the Act relevant to Castellon's argument provides: "[w]henever a communication-impaired person is arrested and taken into custody for an alleged violation of a criminal law, the arresting officer shall procure a qualified interpreter for any custodial interrogation, warning, notification of rights, or taking of a statement." D.C.Code § 2–1902(e) (2004). The government concedes that Castellon was a communication-impaired person within the meaning of the Act and that Officer Chaparro, who interpreted for him and secured his consent to the search had not been certified as a qualified interpreter.[8] However, the government argues that this provision is inapplicable under the circumstances of this case because Castellon had not been arrested and taken into custody at the time he gave his consent to the search.

The plain language of § 2–1902(e) imposes the requirement for a qualified interpreter only when the eligible person is "arrested and taken into custody" and is subject to "custodial interrogation, warning, notification of rights, or taking of a statement." This listing of circumstances is stated in the disjunctive, thereby presenting alternative situations in a *custodial* setting when a qualified interpreter must be provided. A request for a consent to search the property of one who is not in custody is not among the enumerated circumstances covered, and this court will not "read into a statute language that is clearly not there."[9] *See, e.g., 1618 Twenty–*

8. Under the Act, "[a] '[q]ualified interpreter' means a person who is listed by the Officer of Interpreter Services as being skilled in the language ... needed to communicate accurately with a communication-impaired person and who is able to translate information to and from the communication-impaired person." D.C.Code § 2–1901(5) (2004).

9. Other circumstances requiring an interpreter, not pertinent here, include: (1) when a communication-impaired person is a party or

*First St. Tenants' Ass'n v. Phillips Collection,* 829 A.2d 201, 207 (D.C.2003) (citing *Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926)). The maxim of statutory construction, *expressio unius est exclusio alterius,* lends support to the conclusion that consent searches are not within the requirements of the statute. This doctrine stands for the proposition "that the express inclusion of one (or more) thing(s) implies the exclusion of other things from similar treatment." *In re Uwazih,* 822 A.2d 1074, 1078 & n. 5 (D.C. 2003) (quoting WILLIAM D. POPKIN, MATERIALS ON LEGISLATION: POLITICAL LANGUAGE AND THE POLITICAL PROCESS 217 (3d ed.2001) (parentheticals in original)). We apply the maxim with "a considerable measure of caution," since legislative. omission does not always reflect intentional preclusion. *Council of the District of Columbia v. Clay,* 683 A.2d 1385, 1390 (D.C.1996), *cert. denied,* 520 U.S. 1169, 117 S.Ct. 1434, 137 L.Ed.2d 542 (1997). The maxim is only an aid to statutory construction, and therefore is subordinate to " 'clear and contrary evidence of [legislative] intent.' " *Id.* (quoting *Neuberger v. C.I.R.,* 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940) (alterations in original; other citation omitted). The maxim's force turns on whether, considering the statutory structure and legislative history, we can be confident that the draftsman, in expressing one thing, would have likely considered alternatives. *See Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.,* 328 U.S.App. D.C. 74, 81, 132 F.3d 775, 782 (1998). In this case, the statute itself and the legislative history persuade us that the legislature likely considered alternatives

and chose to limit the reach of the Act to the circumstances it expressly identified.

The legislative history of the Act does not mention or suggest that an effort to secure a consent to search during a crime scene investigation is one of the circumstances for which a qualified interpreter must be secured for a communication-impaired person. D.C. COUNCIL REPORT ON BILL 7–108, INTERPRETERS FOR HEARING IMPAIRED AND NON–ENGLISH SPEAKING PERSONS ACT OF 1987 (1987) ("Report"). Rather, the Report specifies clearly that the problem being addressed in section (e) concerns custodial interrogation, which is described as "when a person has been arrested and is being questioned." *Id.* at 3. It explains further that "[t]he purpose of this section is to guarantee that the rights already held by communication-impaired persons in respect to *custodial* interrogation are not violated." *Id.* (emphasis added). The Report's description of custodial interrogation and its statement of purpose leave no reason to doubt that the limitation on applicability of the section to only custodial interrogation was intended.

Additional references in the Report reinforce our confidence that the drafters likely considered and rejected extending the qualified interpreter requirement to other citizen-police encounters. *See Shook, supra,* 328 U.S.App. D.C. at 81, 132 F.3d at 782. Significantly in this regard, the Report explains that it is under circumstances where *Miranda* rights are triggered that this particular qualified interpreter provision comes into play. Report at 3. In discussing the provision for a waiver of rights to an interpreter under section 3(e) (D.C.Code § 2–1902(e)), the

witness before the court in a judicial or quasi-judicial proceeding, or administrative or legislative proceedings before certain entities of the District government; and (2) when need-

ed to assist appointed counsel in criminal, delinquency or child neglect proceedings. D.C.Code §§ 2–1902(a)—(d) (2004).

Report explains that the *Miranda* standard should apply.[10] In *Miranda*, while the Supreme Court held that *Miranda* warnings must be provided to an individual "subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way," it stated that its ruling did not apply to "on-the-scene" questioning for the purpose of obtaining evidence. *Miranda, supra* note 5, 384 U.S. at 477–78, 86 S.Ct. 1602 . In that regard, the Court stated:

> [o]ur decision is not intended to hamper the traditional function of police officers in investigating crime. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. *General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* (emphasis added; internal citations omitted). Thus, the Supreme Court refused to extend the need for warnings under *Miranda* for custodial interrogation situations to the typical consent search. *See id.; see also Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 232, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citing *Miranda,* 384 U.S. at 477–78, 86 S.Ct. 1602). In *Schneckloth,* the Court reasoned that "a search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity." *Id.* at 228, 93 S.Ct. 2041. On the other hand, it explained that the circumstances where most consent searches arise—in a car, home, or office—are generally "informal and unstructured" conditions, "immeasurably far removed from [the] custodial interrogation" described in *Miranda. Id.* at 232, 93 S.Ct. 2041. Therefore, in *Schneckloth,* the Supreme Court rejected the position that proof of the individual's knowledge of the right to refuse consent is a prerequisite to demonstrating that the consent was voluntary. *Id.* at 232–33, 93 S.Ct. 2041. It held that "[r]ather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact [consent] was voluntary or coerced." *Id.* at 233, 93 S.Ct. 2041.

Given their reliance on *Miranda,* it is reasonable to infer that the drafters of the Interpreter Act understood the Supreme Court's rationale for imposing greater precautions in the compelling atmosphere inherent in a custodial setting than it did for an on-the-scene investigation, and chose to follow a similar course. Just as the Supreme Court considered that "it would be thoroughly impractical

---

**10.** Specifically, the Report states:

> The standard for waiving this right follows the currently accepted standard for waiver of *Miranda* rights. That is, a communication-impaired person may waive his or her right to a qualified interpreter, using a qualified interpreter, so long as the waiver is made knowingly, voluntarily and intelligently. Or, a communication-impaired per-

son may waive his or her right to a qualified interpreter *without* the assistance of a qualified interpreter but, as with the waiver of *Miranda* rights, the burden of proof for determining voluntariness is the finding by the court of a preponderance of evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

> Report at 3 (emphasis in original).

to impose on the normal consent search the detailed requirements of an effective warning," *Schneckloth, supra,* 412 U.S. at 231, 93 S.Ct. 2041, so too the drafters of the Interpreter Act must have recognized that it is equally, or conceivably more impractical to impose a requirement that the police retain a "qualified" interpreter in the typical investigatory situation where a consent to search might be sought and intentionally declined to impose such a requirement. Again, making a comparison with *Miranda,* the legislators expressed their intention to provide that "a communication-impaired person may waive his or her right to a qualified interpreter *without* the assistance of a qualified interpreter," upon proof by a preponderance of the evidence that the statement was voluntary. Report at 3 (emphasis in original). They effectuated that intent in D.C.Code § 2–1902(e) which provides for admission of a statement, otherwise excludable from evidence because obtained without a qualified interpreter, if the communication-impaired person waives the right to such an interpreter and "the court makes a special finding upon proof by a preponderance of the evidence that the answer, statement, or admission made by the communication-impaired person was made knowingly, voluntarily, and intelligently."

■ No doubt, the drafters were aware that similar protections exist for consent searches under prior court decisions. In view of the fact that the legislators chose to permit a waiver of the right to a qualified interpreter for custodial interrogation without the assistance of a qualified interpreter, it is inconceivable that the drafters would have required one for consent searches even had they chosen to include such searches within the coverage of the Act. No doubt, they recognized that the individual's rights could be adequately protected by prior court decisions involving consent searches. In order to pass constitutional muster, the government is obligated to demonstrate that any consent to search is in fact voluntary and not the result of coercion. *Schneckloth, supra,* 412 U.S. at 248, 93 S.Ct. 2041. The voluntariness of the consent to search is a factual question to be determined from a careful examination of the unique facts and circumstances of each case. *See id.* at 233, 248–49, 93 S.Ct. 2041. Whether the interpreter conveyed the pertinent information to the person whose consent was sought and whether that person understood it are factors for consideration in determining voluntariness.

For the foregoing reasons, we conclude that the Act's requirement for a qualified interpreter applies only to custodial interrogation. Therefore, we consider next whether Castellon was in custody at the time he consented to the search of his bedroom.

### B. *Custodial Status*

■ Castellon argues that he was in custody at the time that he consented to the search of his bedroom, and therefore, the requirement for a qualified interpreter under the Interpreter Act applies. The government responds that Castellon had not been taken into custody at the time he consented to the search, and therefore the Act does not apply. It contends that Castellon had not been arrested nor had his freedom been curtailed to the extent associated with a formal arrest. The trial court ruled that Castellon, although detained in the apartment, was not in custody within the meaning of the Act.

■ This court has not determined previously the meaning of custody for purposes of determining the applicability of the Interpreter Act. However, we have defined custody in similar contexts. We have defined "custody" for purposes of

determining the applicability of *Miranda* rights, which provide a means to safeguard an individual's "privilege against compelled self-incrimination in the context of custodial police interrogation." *United States v. Turner,* 761 A.2d 845, 850 (D.C.2000) (citing *Miranda, supra* note 5, 384 U.S. at 457, 86 S.Ct. 1602) (other citation omitted). For purposes of *Miranda,* we have distinguished between "custody" and "seizure," recognizing that "custody" is the more onerous of the two.[11] *See id.* at 851 (citing *(Johnny)Harris v. United States,* 738 A.2d 269, 275 (D.C.1999)). Custodial interrogation for *Miranda* purposes turns on "'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *In re E.A.H.,* 612 A.2d 836, 838 (D.C.1992)) (alteration in original; other citation omitted). This test is an objective one, focusing upon "'how a reasonable [person] in the suspect's position would have understood his or her situation.'" *Id.* (quoting *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138) (alteration in original; footnote omitted). Of course, this test "'presupposes an innocent person.'" *Id.* at 851 n. 7 (quoting *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). The test is applied considering the totality of the circumstances, informed by the purpose of the *Miranda* rule. *Id.* at 851 (citations omitted). The determination of whether a person is in custody is a legal conclusion which this court reviews *de novo. See id.* at 850 (citations omitted).

Both the language and legislative history of the Interpreter Act support utilizing the same definition for custody under the Act as we apply for *Miranda* purposes. First, the language of the Act itself, as discussed in the preceding section, specifies that it applies when the suspect is "arrested and taken into custody." D.C.Code § 2–1902(e). Second, the legislative history states that this section of the Act requires a qualified interpreter for "custodial interrogation." Report at 3. Third, that the legislators followed "the currently accepted standard for waiver of *Miranda* rights," *id.,* suggests that *Miranda* would also be an appropriate reference for determining custody under the Act. Finally, it is clear that not every police-citizen encounter was intended to trigger the necessity for a qualified interpreter under the Act,[12] as the requirement is limited to certain well-defined situations, including when a person is "arrested and taken into custody." *See* D.C.Code § 2–1902(e). For all of these reasons, we are persuaded that the definition of custody for *Miranda* purposes is the appropriate standard for determining whether the circumstances are such that an individual's right to a qualified interpreter arises under the Act. Applying this well-established standard, we agree with the trial court that Castellon was not in custody at the time he consented to a search of his room.

Castellon argues that the trial court found that he was in custody at the time he was informed of his rights to withhold consent to the search and that he was detained at the time the police searched his room. He contends that these findings

---

**11.** "'A seizure occurs when the police have by word or conduct manifested to the suspect that he is not free to leave, and in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Turner, supra,*

761 A.2d at 851 (quoting *Patton v. United States,* 633 A.2d 800, 814 (D.C.1993), *cert. denied,* 520 U.S. 1221, 117 S.Ct. 1717, 137 L.Ed.2d 840 (1997)).

**12.** *See supra* note 8.

cannot be disturbed unless they are clearly erroneous and that they are not. First, the record does not bear out Castellon's claim that the trial court made a finding that he was in custody. Rather, the record shows that the trial court found only that he had been "detained." Second, although we will not disturb the trial court's factual findings unless clearly erroneous or without evidentiary support, the ultimate determination of whether a seizure has occurred is a question of law which we review independently. (*Johnny*)*Harris, supra,* 738 A.2d at 274. *Accord, Turner, supra,* 761 A.2d at 850 (the determination of whether a person is in custody is a legal conclusion which this court reviews *de novo*). Having reviewed the record, we conclude that the police restraint of Castellon's movements did not approach the level of formal arrest or custody required under *Miranda,* and thus, come within the meaning of the Interpreter Act.

■ It is undisputed that the police officers prohibited Castellon from returning to his bedroom and restricted him to the living room/dining room areas before they obtained his consent to search the bedroom. However, these circumstances do not necessarily mean that Castellon was in custody. "[A] restraint on liberty which would constitute a seizure under the doctrine of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does not necessarily place the seized person in custody for *Miranda* purposes." *E.A.H., supra,* 612 A.2d at 838 (citing *McIlwain v. United States,* 568 A.2d 470, 472–73 (D.C.1989)) (other citation and footnote omitted). "Moreover, this court has ... rejected the notion that a person [is] in custody for *Miranda* purposes because he was questioned during the execution of a search warrant in his home, even though he was not free to leave." *Id.* (citing *Tyler v. United States,* 298 A.2d 224, 226–27 & n. 4

(D.C.1972); *Wells v. United States,* 281 A.2d 226, 228 (D.C.1971), *cert. denied,* 405 U.S. 995, 92 S.Ct. 1271, 31 L.Ed.2d 464 (1972)). However, "[s]eizure and custody ... are not the same thing." (*Johnny*)*Harris, supra,* 738 A.2d at 274 (citing *Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999)). *See also Turner, supra,* 761 A.2d at 851 ("Custody is clearly more than seizure alone.") (citing (*Johnny*) *Harris,* 738 A.2d at 275). It is fair to say that the circumstances presented here justified Castellon in believing that he was not free to leave the living room area or the apartment for that matter. However, we can conclude from this only that Castellon may have been seized within the meaning of the Fourth Amendment. *See* (*Johnny*) *Harris,* 738 A.2d at 274–75 ("An individual is 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

The foregoing discussion illustrates that a seizure is only a part of the analysis for determining whether a person has been arrested and thus, in custody. *See Giles v. United States,* 400 A.2d 1051, 1053 (D.C. 1979) (stating that "[t]he essence of an arrest is a restraint of freedom" and including seizure as part of analysis of when restraint has occurred). Thus, the fact that Castellon was not free to leave the apartment does not necessitate a finding that he was in custody, absent other facts tending to show that "there was a formal arrest or restraint on [his] freedom of movement of the degree associated with a formal arrest." *Turner, supra,* 761 A.2d at 851 (citation and internal quotation marks omitted). Therefore, we consider whether other indicia of formal arrest were shown to be present here.

Helpful to our review are cases which distinguish between *Terry* investigatory stops and full blown arrests. *See, e.g., In re M.E.B.*, 638 A.2d 1123, 1126 (D.C.1993), *cert. denied,* 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994).[13] Factors relevant in distinguishing between the two are, among others, the length of detention, the place of detention, the use of handcuffs, the use of weapons and the announcement of an intent to arrest. *Hicks v. United States,* 730 A.2d 657, 660 (D.C.1999); *see also M.E.B.*, 638 A.2d at 1126. An examination of these factors in this case supports the conclusion that Castellon was not in custody during his brief restriction before he consented to the search. The police entered the apartment with the consent of Castellon's brother-in-law, who lived there. Once inside, the police knocked at Castellon's door and awaited his response. When Castellon came out of the bedroom, upon learning that he did not speak English very well, the police did not try to converse with him. Instead, they awaited the arrival of Officer Chaparro, who spoke Castellon's native language. The brief duration of the seizure also weighs against a finding of custody. While Castellon was not free to leave, he was allowed to remain in the familiarity of his home, restricted only from re-entering the bedroom during the fifteen to twenty-minute wait. Brief detention in one's home may not approach the level of restraint necessary to establish custody, even if the suspect is not free to leave. *See E.A.H., supra,* 612 A.2d at 838–39 (citing *Tyler, supra,* 298 A.2d at 226–27 & n. 4 (other citation omitted)). That Castel-

lon was detained in only his home weighs against a finding that he was in custody at the time the police sought his consent.

Further, Castellon was not handcuffed or physically restrained, which is a significant factor in the custody analysis for we have said that even the use of handcuffs does not necessarily convert a *Terry* stop into a custodial arrest. *See, e.g., Hicks, supra,* 730 A.2d at 660; *M.E.B., supra,* 638 A.2d at 1127 ("We cannot say that the additional restraint caused by the handcuffing was such an intrusion that the handcuffing transformed the character of the restraint to an arrest."). Therefore, the omission of such a restraint is another factor weighing against a finding that an arrest occurred. Finally, although the officers were armed, no guns were used or displayed during the encounter. The whole encounter appears to have been non-threatening. These circumstances support the conclusion that Castellon was not in custody. *Cf. United States v. Drayton,* 536 U.S. 194, 204–05, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (fact that officers were armed was entitled to "little weight" in custody analysis as "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon") (*cited with approval in State v. Green,* 375 Md. 595, 826 A.2d 486, 498 (2003)). Considering the relevant factors in the aggregate, the conclusion is warranted that Castellon was not in custody when he consented to the search. Since Castellon was not in custody, the provisions of the Interpreter Act were not triggered.[14] We turn then to consideration of

---

**13.** "Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court." *M.E.B., supra,* 638 A.2d at 1126 (citations omitted). "A *Terry* seizure . . . involves

a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." *Id.* (citations omitted).

**14.** Castellon also argues that he was in custody because the police already had probable

Castellon's challenge that he did not voluntarily consent to the search.

### C. *Voluntariness of the Consent to Search*

 Castellon argues that his consent to search was not voluntary. Specifically, he contends that the totality of the circumstances, including "the presence of uniformed, armed officers; the significant curtailment of [his] freedom; his inability to understand English; and Officer Chaparro's unambiguously coercive language—render any consent given by [him] involuntary and invalid." The question of whether a person has voluntarily consented to a search is a "question of fact to be determined from all the circumstances[.]" *See In re J.M.*, 619 A.2d 497, 500 (D.C. 1992) (en banc) (quoting *Schneckloth, supra*, 412 U.S. at 227, 248–49, 93 S.Ct. 2041). As such, this court is bound to uphold the trial court's findings in this regard unless these findings are clearly erroneous. *See id.; see also Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002). Having considered each of Castellon's arguments, in light of the totality of the circumstances, we conclude that the record supports the trial court's ruling that Castellon voluntarily consented to the search of his room.

First, as previously indicated, there was no showing that more than three officers were in the apartment at the time they secured Castellon's consent to search.[15] The presence of multiple officers is only one factor to be considered in evaluating whether the consent was coerced. *See, e.g., United States v. Winningham*, 140

F.3d 1328, 1332 (10th Cir.1998). The officer's conduct during the encounter is also important to the voluntariness analysis. Here, the officers never drew or displayed their weapons in a threatening manner. Again, where the police officers keep their weapons holstered during the entire encounter, the court will have some difficulty finding that there was coercion simply because the officers had them available. *See, e.g., Drayton, supra*, 536 U.S. at 205, 122 S.Ct. 2105 ("The presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."). Second, although not free to leave, Castellon remained in the familiar surroundings of his home, and he was not subject to full arrest nor curtailed significantly in his freedom. *Cf. United States v. (Juan) Pena*, 924 F.Supp. 1239, 1245, 1252–53 (D.Mass.1996). Third, that Castellon spoke little English has no persuasive force here because a police officer who spoke Castellon's native language translated for him the request and Consent to Search form. The trial court's finding that Officer Chaparro "had no difficulty communicating with [Castellon] because of the Spanish language[,]" is supported by the evidence. Thus, in this case, any language barrier was eliminated. *See, e.g., United States v. Marin*, 761 F.2d 426, 434 (7th Cir.1985) (affirming denial of suppression motion where Spanish translation of consent form adequately communicated that defendant could refuse to consent to the search); *United States v. (Amado) Pena*, 542 F.2d 292, 294 (5th Cir.1976) (consent was voluntary where defendant was repeatedly advised of his right not to consent to the search in Spanish as

---

cause to arrest him by the time they presented him with the Consent to Search form. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer, supra*, 468 U.S. at 442, 104 S.Ct. 3138; *see Turner, supra*, 761 A.2d at 851.

**15.** *See supra* note 4.

well as English). Similarly, here, the record supports the trial court's finding that Castellon understood Officer Chaparro's Spanish translation, and specifically his right to refuse consent.

Finally, Castellon argues that his consent was not voluntary because the language that Officer Chaparro used was coercive. Specifically, he refers to the officer's choice of words in explaining that the police wanted to search his room. Officer Chaparro testified that he told Castellon that they "needed" to go into his room and that they "needed" him to sign the consent form in order for them to do so. The trial court considered the officer's choice of words and their possible impact; however, the court considered also that the officer translated the form which explained to Castellon that he was not required to agree to the search. Castellon said that he understood everything, asked no questions and signed the consent to search. Considering all of the circumstances, the trial court concluded that the government had demonstrated that Castellon's consent to the search was voluntary. The record supports the trial court's ruling. The record shows that Castellon had no barriers to comprehension. He was not under the influence of drugs or alcohol, and there is no evidence of intellectual barri-

ers to his understanding. His brother-in-law, who spoke English and lived in the apartment, was present, but Castellon did not ask him for assistance. *See, e.g., United States v. Rojas,* 783 F.2d 105, 109–10 (7th Cir.), *cert. denied,* 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986) (although defendant was in custody, handcuffed, and had a slight language barrier, the presence of such "subtly coercive" factors was outweighed by the fact that defendant was of sufficient age and intellect and no direct force or intimidation was used).

## III.

■ Castellon argues that the trial court erred in ruling that his statements, obtained in violation of the Interpreter Act, were voluntary and could be used for impeachment purposes. He offers two arguments. First, he argues that the trial court erred in concluding that he voluntarily gave the statement to the police. Second, he contends that even if the statement was voluntary, the court erred by failing to address specific factors concerning the trustworthiness of his statement—a factor that must be established before a statement elicited in violation of the Interpreter Act may be used for impeachment purposes.[16] *See Harris v. United States,* 401

---

**16.** Specifically, Castellon refers to a list of factors identified in Judge Ferren's concurring opinion in *Barrera v. United States,* 599 A.2d 1119, 1133–34 (D.C.1991). That concurrence provides a list of factual findings on reliability and trustworthiness that the trial court should make when a statement is obtained in violation of the Interpreter Act. These include:

(1) the degree to which the defendant and the interrogating police officer each spoke the same language and thus understood one another's words ("communication"); (2) whether there is evidence the defendant clearly comprehended the context, meaning, and implications of the police officer's

questioning ("comprehension"); (3) how well the police interrogator recalls the precise words used by each party to the interrogation ("recollection"); (4) whether there is any evidence that corroborates the government's identification of the specific words used, respectively, by the police interrogator and by the non-English speaking defendant ("corroboration"); and (5) the degree of contradiction between the defendant's statements during the illegal interrogation and his testimony at trial ("inconsistency").

599 A.2d at 1133–34. Although acknowledging that the considerations listed in the opinion might properly guide the trial court's

U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (Evidence inadmissible against the accused on *Miranda* grounds in prosecutor's case in chief, is not barred for all purposes provided "the trustworthiness of the evidence satisfies legal standards."). The government argues that Castellon failed to preserve the issue for review because (1) he did not testify, and (2) he did not request the court to make factual findings. Further, the government contends that the record supports the trial court's determination that Castellon's statement was given voluntarily.

The government concedes that the trial court did not make explicit factual findings regarding trustworthiness and reliability of the statement. However, the government argues that Castellon should be precluded from asserting this claim because he did not request the court to make findings on those issues even though the court inquired whether there were any other factual or legal issues to be addressed. Even assuming the issue was adequately preserved for review, we agree with the government that Castellon cannot prevail on the merits of his voluntariness claim.[17]

The record reflects that the trial court first concluded that although appellant had made a knowing waiver of his *Miranda* rights, his statement could not be used in the government's case in chief because he had not been afforded the rights guaranteed by the Interpreter Act. The court then considered whether the statement was made voluntarily. The court found that there had been no more coercion than that inherent in a standard custodial interrogation; that the officer who questioned appellant was Spanish-speaking and had no difficulty communicating with him; that appellant had initialled the waiver card expressing his willingness to waive his rights; and that there was no evidence other than that the statement was given voluntarily. Therefore, the court concluded that the statement was voluntarily given and that the government could use it in rebuttal.

■■■■■ The government argues that Castellon's claim fails on the merits because the trial court's finding that his statement was voluntary is supported by the evidence. We agree. A statement is involuntary only if " 'under the totality of the circumstances, the will of the suspect was overborne in such a way as to render his confession the product of coercion.' " *Turner, supra,* 761 A.2d at 854 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (further citations omitted)). The factors for consideration in determining whether a statement was voluntarily made include, " 'the circumstances surrounding the questioning, the accused's age, education, and prior experience with the law, his physical and mental condition at the time the statement was made, other factors showing coercion or trickery, and the delay between the suspect's arrest and confession.' " *Id.* (quoting *(Robert) Davis v. United States,* 724 A.2d 1163, 1168 (D.C.1998), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)); *see also Beasley v. United States,* 512 A.2d 1007, 1015 (D.C. 1986), *cert. denied,* 482 U.S. 907, 107 S.Ct. 2485, 96 L.Ed.2d 377 (1987) (adding among

---

decision on voluntariness, the majority in *Barrera* declined to make mandatory such subsidiary findings. *Id.* at 1137–38. In any event, in this case, the trial court substantially covered the pertinent considerations in *Barrera.*

**17.** As we decide these issues in favor of the government, we need not and do not decide

whether Castellon properly preserved this issue for review under *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) and *Bailey v. United States,* 699 A.2d 392 (D.C.1997).

other factors the duration of the questioning, physical coercion, or promises of leniency). The government must establish voluntariness by a preponderance of the evidence. *See Turner,* 761 A.2d at 854. "This court applies a *de novo* standard of review to the legal determination regarding voluntariness and reviews for clear error the factual findings supporting that determination." *Id.* at 853 (citing *Moctar v. United States,* 718 A.2d 1063, 1070 (D.C. 1998)). " 'The facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." ' *Id.* (quoting *Moctar,* 718 A.2d at 1070). Applying that standard of review, and considering the totality of the circumstances, we agree with the trial court that the record supports the conclusion that Castellon voluntarily, knowingly and intelligently gave the statement.

As the government points out, Castellon had to wait only sixty minutes before the police interviewed him. Officer Chaparro testified that he was a certified Spanish-language interpreter for the police department and that he read Castellon his *Miranda* rights in Spanish. We know from their earlier encounter that Castellon had no difficulty understanding Officer Chaparro. The police did not question Castellon until he agreed to waive his rights and signed a Spanish-language "waiver-of-rights" card. The police questioned him for only twenty-five minutes. Although Castellon was handcuffed, a factor for consideration in the analysis, there is no evidence that the police harmed him physically or verbally threatened him. The record provides a sufficient basis to support the trial court's conclusion that Castellon gave the statement voluntarily and properly ruled that it was admissible for impeachment purposes.

 We agree with Castellon that under *Barrera,* a statement elicited in viola-tion of the Interpreter Act may be used for impeachment only if the evidence supports a trial court finding that the statement satisfied "the legal standard of trustworthiness established by the Interpreter Act." *Barrera, supra* note 16, 599 A.2d at 1133. That standard of trustworthiness is analogous to that used for the impeachment exception to *Miranda's* exclusionary rule. *Id.* at 1132; *see Harris, supra,* 401 U.S. at 224–26, 91 S.Ct. 643 (Evidence inadmissible on *Miranda* grounds is admissible for impeachment purposes provided "the trustworthiness of the evidence satisfies legal standards."). From the record, however, it appears that defense counsel did not ask the trial court to make findings on trustworthiness. After making its findings and concluding that the statement could be used in rebuttal, the court then inquired of the prosecutor and defense counsel, "Are there any other factual issues or legal issues you would like me to address in regard to the motion?" Defense counsel made no request in response to the court's direct invitation. It has been held that "when a trial court omits an essential finding of fact, the failure to object to that omission results in a waiver." *United States v. Caballero,* 290 U.S.App. D.C. 235, 239, 936 F.2d 1292, 1296 (1991) (citing *United States v. Williams,* 262 U.S.App. D.C. 112, 115, 822 F.2d 1174, 1177 n. 39 (1987); *United States v. Allen,* 203 U.S.App. D.C. 17, 23, 629 F.2d 51, 57 n. 5 (1980); *United States v. Lindsay,* 165 U.S.App. D.C. 105, 109, 506 F.2d 166, 170 (1974); *Scarbeck v. United States,* 115 U.S.App. D.C. 135, 151, 317 F.2d 546, 562, *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963)). Absent such findings or request for the same by the defense, "we must uphold the ruling of the trial court if there is any reasonable view of the evidence that will support it." *Scarbeck,* 115 U.S.App. D.C. at 151, 317 F.2d at 562; *see Williams v. United States,* 576

A.2d 700, 703 (D.C.1990) (citing *United States v. Covington,* 385 A.2d 164–166 (D.C.1978)) (other citations omitted); *see also Culp v. United States,* 624 A.2d 460, 462–63 (D.C.1993) (citations omitted).

It is a difficult question whether a trustworthiness finding, inherent in a trial court ruling on impeachment by a statement that violates the Interpreter Act, can be deemed waived when defense counsel, in raising an Interpreter Act violation, fails to call the court's attention to this required second prong of the analysis. We need not resolve that issue here because the record reflects that the trial court's finding of voluntariness adequately considered the reliability and trustworthiness of the statement. The trial court credited the testimony of Officer Chaparro, the police officer who translated Castellon's videotaped statement.[18] The court found, in accordance with the officer's testimony that: (1) Spanish, Castellon's language, was Officer Chaparro's first language; (2) Castellon had no difficulty communicating with Officer Chaparro; (3) Castellon had no difficulty understanding the officer; (4) Castellon had spoken with the same officer earlier at his apartment and had no difficulty understanding the information conveyed by the officer;[19] and (5) Castellon initialed the rights card, indicating that he understood the rights as read to him by Officer Chaparro in Spanish. While the court's ruling does not include an exhaustive list of reliability factors,[20] it is sufficient to show that "in the totality of the circumstances—including the barriers created by translation into a foreign tongue of the defendant's statements made in Spanish—appellant's statements satisfied basic trustworthiness sufficient to allow their use for the limited purpose of impeachment." *Barrera, supra* note 16, 599 A.2d at 1137 (Farrell, J., joined by Schwelb, J., concurring).

## IV.

Finally, Castellon argues that the trial court erred in denying his request to call the victim's mother, Ms. M., as a character witness to testify concerning the complaining witness' reputation for untruthfulness. He contends that the trial court's refusal to compel the attendance of the witness violated his Sixth Amendment right to compulsory process and to present a defense. The government responds that Castellon's proffer of testimony was speculative and inadmissible, and there was no showing that it would be either material or favorable. Therefore, the government argues, there was no violation of Castellon's constitutional rights and that any error was harmless.

A defendant in a criminal trial has the right to present evidence in his own defense. *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986). " "The right to

18. Although the statement was videotaped, the audio portion did not record. Therefore, Officer Chaparro wrote down what Castellon said during the interview. Considering these circumstances, the trial court left for later consideration whether the statement would come in at all based on evidentiary grounds, as opposed to constitutional grounds. Appellant did not testify, and it does not appear that he ever raised the issue again.

19. Castellon's brother-in-law, who spoke English and Spanish, was present during this exchange, and neither raised any issues concerning the translation.

20. *See Barrera, supra* note 16, 599 A.2d at 1133–34 ( Ferren, J., separate opinion) (setting forth non-exhaustive list of reliability factors and noting that "the government's failure to make a strong showing on every one need not be fatal to admissibility"); *see also id.* at 1137 (Farrell, J., concurring, joined by Schwelb, J.) (declining to prescribe a list of required subsidiary findings).

offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense... [and] a fundamental element of due process of law.'" *Id.* (quoting *Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). In *Washington,* the Supreme Court held that the petitioner was denied the right to compulsory process where the state "arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Washington,* 388 U.S. at 23, 87 S.Ct. 1920. In *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Supreme Court explained that the *relevant* and *material* language in *Washington* suggests that to establish a constitutional violation, more than a showing of the deprivation of testimony is required. *Id.* at 867, 102 S.Ct. 3440. There must be "some plausible showing of how [the witness'] testimony would have been both material and favorable to [the] defense." *Id.* Although the Court in *Valenzuela–Bernal* did not expressly define the term "material," it indicated that the loss of evidence is most damaging where "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873–74, 102 S.Ct. 3440 (citation omitted). The court also suggested that materiality might be found where the evidence of guilt is weak, *see id.* at 868, 102 S.Ct. 3440, or where the defendant can show that the excluded evidence would have assisted his defense "in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. 3440. "The trial court has discretion in exercising its power to secure the attendance of witnesses, but that discretion must be exercised in a manner consistent with the

defendant's constitutional rights." *(Michael) Harris v. United States,* 834 A.2d 106, 124 (D.C.2003) (citations omitted).

Before reviewing Castellon's argument applying the foregoing principles, we recount briefly the circumstances giving rise to his argument. Ms. M. had been subpoenaed by the prosecutor who decided not to call her, but at the request of defense counsel, asked her to return the following day. Ms. M. informed the court that she would not be able to return because she was the only care-giver for her husband, who was having an operation on both of his eyes. Defense counsel suggested that the witness make herself available during a one and one-half hour time period, and the court excused her. The next day, the court inquired of defense counsel if he had spoken to Ms. M. He responded that Ms. M. had been reluctant to speak with him and that she told him that she was for the government and would not come to court. At that time, defense counsel proffered that he actually wanted the witness to testify that the complainant used numerous aliases, including the name of her sister under circumstances where it might harm her sister's reputation.

Castellon argues that the evidence against him was weak, and therefore, Ms. M.'s. testimony would have undermined the credibility of the complaining witness. First, the proffer Castellon made finally concerning Ms. M.'s expected testimony was not admissible under our case law. As the government argues, specific instances of truthfulness are not the proper subject of character evidence. *See Rogers v. United States,* 566 A.2d 69, 73 (D.C. 1989) (en banc) (noting that "[t]his jurisdiction [does] not allow[ ] testimony about specific acts as affirmative proof of character") (citations omitted). Second, the complaining witness admitted during testimony that she had been arrested several

times and used various aliases, including her own sister's name under circumstances that would impugn her sister's reputation. Therefore, the proffered testimony was cumulative at best. Third, since defense counsel had not been able to speak with Ms. M. to ascertain any information that she had that might be relevant and favorable to the defense, the proffer of her testimony was speculative. Castellon failed to show that the testimony was material and favorable or that there is a reasonable likelihood that it "could have affected the judgment of the trier of fact." *See Valenzuela–Bernal, supra,* 458 U.S. at 874, 102 S.Ct. 3440. On this record, we find no constitutional error in the trial court's determination not to compel Ms. M.'s attendance at trial.

█ In any event, as the government argues, any error in this regard is harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Since Ms. M.'s proposed testimony was not only cumulative, but less damaging than M.D.'s

actual testimony concerning her arrests and aliases, it is difficult to say that Castellon was prejudiced by the exclusion of Ms. M.'s testimony. Because it appears beyond a reasonable doubt that the alleged error did not contribute to the verdict of guilt, the error was harmless. *See, e.g., Smith v. United States,* 709 A.2d 78, 81 n. 7 (D.C.1998) (*Chapman* standard requires finding of harmlessness where "the guilty verdict actually rendered in [the] trial was surely unattributable to the [alleged] error") (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279–80, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*