**Joseph MESA, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 02–CF–915.**

District of Columbia Court of Appeals.

Argued March 9, 2005.

Decided May 12, 2005.

Ferris R. Bond, appointed by the court, Washington, for appellant.

David B. Goodhand, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

REID, Associate Judge.

A jury convicted appellant Joseph Mesa of multiple crimes, including two counts of first-degree murder while armed of Eric Plunkett and Benjamin Varner, in violation of D.C.Code §§ 22–2401, –3202 (1996), recodified at D.C.Code §§ 22–2101, –4502 (2001). He challenges the trial court's determination that he failed to establish the existence of a common law marriage with a government witness, and hence, he could not invoke the marital privilege to preclude her testimony against him, or the introduction of his letters to, and conversations with her. He also contends that the trial court erred by not granting his motion to suppress statements which he maintains were obtained in violation of (1) the Interpreters for Hearing Impaired and Non-English Speaking Persons Act of 1987 ("the Interpreter Act"), D.C.Code §§ 2–1901 *et seq.*, and (2) his *Miranda*[1] rights. We hold that Mr. Mesa failed to sustain his burden of showing, by a preponderance of the evidence, that he and the government witness had a common law marriage, and hence, he was not entitled to invoke the marital privilege with respect to her testimony and his communications with her. We further hold that the trial court properly denied Mr. Mesa's motion to suppress since neither the Interpreter Act nor his *Miranda* rights were violated. Therefore, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

Mr. Mesa, a native of Guam and a profoundly hearing-impaired person, enrolled as a freshman student at Gallaudet University in Fall 2000. On September 28, 2000, the body of Eric Plunkett, also a Gallaudet student, was found after Mr. Mesa alerted a Resident Advisor at his dormitory that there was a "funny" smell coming from Mr. Plunkett's room. Months later, on February 3, 2001, the body of another Gallaudet student, Benjamin Varner, was discovered by a Resident Advisor at the same dormitory when Mr. Varner did not respond to a fire alarm. Tragically, both Mr. Plunkett and Mr. Varner had been murdered. Mr. Plunkett died of "blunt impact trauma to the head and neck." Mr. Varner was stabbed multiple times in the head, face, neck and chest, and was kicked or hit. After physical evidence tied Mr. Mesa to the murders, he confessed that he had killed both Mr. Plunkett and Mr. Varner. Subsequently, he was tried and convicted of both murders, as well as several other crimes.[2] He

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The other convictions were: first-degree burglary while armed (Eric Plunkett), in violation of D.C.Code §§ 22–1801(a), –3202 (1996), recodified at 22–801(a), –4502 (2001); armed robbery (Eric Plunkett), in violation of §§ 22–2901, –3202, recodified at §§ 22–2801, –4502; first-degree felony murder while armed—felony murder (relating to burglary of Eric Plunkett), in violation of §§ 22–2401, –3202, recodified at 22–2101, –4502; first-degree murder while armed—felony murder (relating to robbery of Eric Plunkett), in violation of §§ 22–2401, –3202, recodified at 22–2101, –4502; credit card fraud (Eric Plunkett), in violation of § 22–3823(d)(2), recodified at § 3223(d)(2); credit card fraud (Chad Shumaker), in violation of § 22–3823(d)(2), recodified at § 3223(d)(2); first-degree burglary while armed (Benjamin Varner), in violation of §§ 22–1801(a), –3202; recodified at 22–801(a), –4502; armed robbery (Benjamin Varner), in violation of §§ 22–2901, –3202, recodified at §§ 22–2801, –4502; first-degree murder while armed—felony murder (relating to burglary of Benjamin Varner), in violation of §§ 22–24011, –3202, recodified at §§ 22–2101, –4502; first-degree murder while armed—felony murder (relating to robbery of Benjamin Varner), in violation of §§ 22–2401, –3202, recodified at §§ 22–2101, –4502; carrying a dangerous weapon, in violation of § 22–3204(a), recodified at § 22–4504(a); forgery, in violation of §§ 22–3841, –3842(b),

filed a timely appeal of his judgment of conviction.

## ANALYSIS

### *The Alleged Common Law Marriage*

Mr. Mesa argues that the trial court erred in failing to recognize his relationship with Melani de Guzman, a government witness, as a common law marriage. He complains that because of his common law marriage and the marital privilege, the trial court should have suppressed letters he wrote to and conversations he had with Ms. de Guzman, and that it should have disallowed her testimony. The government maintains that the trial court's determination that no common law marriage existed between Mr. Mesa and Ms. de Guzman was not plainly wrong or without evidence to support it.

The trial court concluded that the defense established "by more than a preponderance [of the evidence] that [Mr. Mesa and Ms. de Guzman] intended to be married ... at some future time ...[,][n]ot that they are presently married." Furthermore, the trial court decided that "all the objective material" indicated that there was no actual common law marriage between Mr. Mesa and Ms. De Guzman.

"The elements of a common law marriage in this jurisdiction are cohabitation as husband and wife, following an express mutual agreement, which must be in words of the present tense." *Coates v. Watts,* 622 A.2d 25, 27 (D.C.1993) (citing *East v. East,* 536 A.2d 1103, 1105 (D.C. 1988)). The parties may provide direct evidence of their common law marriage. *See Marcus v. Director, Office of Workers' Comp. Programs v. U.S. Department of Labor,* 179 U.S.App.D.C. 89, 548 F.2d 1044 (1976). Other than the testimony of the parties claiming to be in a common law marriage, direct evidence may include deeds to property and tax returns. *See Coates, supra,* 622 A.2d at 26. In addition, "[t]he existence of an agreement may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship." *Marcus, supra,* 179 U.S.App.D.C. at 93 n. 9, 548 F.2d at 1048 n. 9 (citation omitted). An inference "may nevertheless be rebutted by direct evidence that, in fact, there was no present agreement." *Id.* However, if an appellant proves the existence of a valid common law marriage, the marital privilege, codified in D.C.Code § 14–306 (2001), is applicable. D.C.Code § 14–306 provides:

> (a) In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.
>
> (b) In civil and criminal proceedings, a husband or his wife is not competent to testify as to any confidential communications made by one to the other during the marriage.

Furthermore, while "[t]he District of Columbia has long recognized common law marriages," *Coates, supra,* 622 A.2d at 27 (citing *Hoage v. Murch Bros. Constr. Co.,* 60 App.D.C. 218, 50 F.2d 983 (1931)), such marriages are "closely scrutinized," *id.* (citations omitted). Here, the burden was on Mr. Mesa "to prove, by a preponderance of the evidence, all of the essential elements of a common law marriage." *Id.* (citations omitted). Whether a common law marriage exists is largely a factual determination. Thus, we will affirm the trial court's findings regarding the existence of a common law marriage

recodified at §§ 22–3241, –3242(b); and uttering, in violation of §§ 22–3841, –3842(b).

"unless appellant can persuade us that it is plainly wrong or without evidence to support it." *East, supra,* 536 A.2d at 1106 (citing D.C.Code § 17–305(a) (1981)). And, the applicability of the marital privilege, in Mr. Mesa's case, depends upon the existence of a valid common law marriage.

Although Ms. de Guzman testified that Mr. Mesa was her husband and provided examples of how they held themselves out as man and wife, the trial judge discredited her testimony saying, "I do not believe her .... I think there is too much objective evidence cutting against her." The trial court also found that the "various objective indicia that [defense counsel] point[ed] to are things [Ms. de Guzman] has put together somewhat after the fact"; and that while the two "intended to be married ... at some future time, ... they are [not] presently married...."

Ms. de Guzman testified that: she had been wearing a wedding ring since the year 2000; she and Mr. Mesa lived together at Gallaudet University; she uses the last name of Mesa and had a magazine subscription in the name of Melani Mesa; she and Mr. Mesa used the same post office box; she had a wedding book and a certificate of marriage to commemorate their agreement to marry; and Mr. Mesa gave her a Bible with the inscription "Melani de Guzman, wife." Yet, the record before the court showed that Ms. de Guzman's driver's license and financial aid application for Gallaudet bore the name Melani de Guzman, not Melani Mesa, and both documents revealed that she was single. When she spoke with one of the Metropolitan Police Department ("MPD") detectives, in the grand jury and at the D.C. jail, she represented that Mr. Mesa was her "boyfriend" rather than her husband. Significantly, she admitted creating the wedding book, and the computer-generated wedding certificate, after Mr. Mesa was arrested in February of 2001. Moreover, the record reflects that she and Mr. Mesa had separate dormitory rooms, and they did not apply for married housing, although it was available. Other indications that the two did not have a common law marriage included the fact that Ms. de Guzman told only a few friends that she was married and often did not wear the wedding ring. As the trial court said:

> [I]f indeed they were married, not intending to be married, I have heard no reason why they would have been keeping that secret from everyone but people they trusted[,] i[n] her words. Why ... would [she] call herself fiancee which is someone who intends to be married, or refer to herself as his girlfriend, [and] there is not the sort of cohabitation that one would associate with a common law marriage in the absence of a formal ceremony.

Given the trial court's credibility determination regarding Ms. de Guzman's testimony, and the evidence in the record that, although Mr. Mesa and Ms. de Guzman may have intended marriage at some future date, they in fact were only girlfriend and boyfriend or at most affianced, we are satisfied that Mr. Mesa did not sustain his burden of showing, "by a preponderance of the evidence, all of the essential elements of a common law marriage," *Coates, supra,* 622 A.2d at 27. Therefore, Mr. Mesa was not entitled to invoke the marital privilege with respect to Ms. de Guzman's testimony, the letters he wrote to her, and his conversations with her. *See Coates* and *East, supra.*

***The Motion to Suppress Statements***

Mr. Mesa argues that the trial court erred in denying his motion to suppress his statements to police. He claims that the trial court violated the Interpreter Act by not providing a qualified interpreter within the meaning of the Act, which he

maintains it could not do because the Office of Interpreter Services called for by the Act has never been established. He further contends that even though he signed a waiver form his "waiver did not comply with the mandatory requirements of the Interpreter[ ] Act, [since he] did not consult with an attorney as required," and it "was not approved by an appointing authority." In the alternative, he asserts that the Act was violated because the Metropolitan Police Department ("MPD") paid for the interpreters assigned to him. Furthermore, he claims that he did not "knowingly, voluntarily and intelligently" waive his *Miranda* rights.

The government maintains that the trial court did not err in denying Mr. Mesa's motion to suppress his statements because he was twice informed "that he had the statutory right to have the *Miranda* protections 'explained' to him 'through a qualified interpreter listed by the office of interpreter services.' " Mr. Mesa, who had no difficulty reading and understanding the English language, read a document explaining his right to a qualified interpreter, and then "the right was signed to him [in American Sign Language] by the full-time Gallaudet interpreters." The government counters Mr. Mesa's argument concerning the non-existence of the Office of Interpreter Services by referencing this court's decision in *Ko v. United States,* 722 A.2d 830, 835 (D.C.1998) (en banc), where we determined that, as far as the D.C. Courts are concerned, the functions of that statutorily-mentioned office are now carried out by the D.C. Courts' Office of Court Interpreting Services (OCIS) which maintains a list of qualified interpreters. Furthermore, the government insists that Mr. Mesa "knowingly and voluntarily declined the services of a 'qualified interpreter' (as that term is defined by the Interpreter Act)," his written waiver was valid, and the trial court properly construed the Interpreter Act. Moreover, the interpreters provided to Mr. Mesa were full-time Gallaudet employees, not employees or agents of the MPD. And, the government asserts that Mr. Mesa "knowingly, voluntarily, and intelligently waived his constitutional rights."

***The Factual Context***

Before analyzing the parties' contentions, we set forth the factual context for their arguments. Evidence presented by the government shows that on the morning of February 12, 2001, MPD Detective Pamela Reed, one of the lead detectives assigned to the investigation of Mr. Varner's murder, went to Riggs Bank to review a security tape of a person who cashed a check on Mr. Varner's account. The check had been "made out to Joseph Mesa." Detective Reed returned to the command center that the police had established at Gallaudet and asked to see Mr. Mesa. When Mr. Mesa arrived with Ms. de Guzman, Detective Reed "got some interpreters" and, with their assistance, spoke with Mr. Mesa in a room in the dormitory after her partner Detective Darryl Richmond and a Detective Murphy arrived. Mr. Mesa's movements were not restricted and he was not restrained by handcuffs; nor were any police weapons drawn.

Carolyn Ressler, one of the Gallaudet sign language interpreters, testified at trial that she began interacting with Mr. Mesa on the day prior to his February 13, 2001 videotaped confession. At the time of trial, Ms. Ressler had been working full-time as a staff interpreter at Gallaudet University for eight years. She received partial certification in the field of sign language interpretation in 1985 from the National Association of Registered Interpreters for the Deaf, with a full certification in 1989 ("certificate of interpreting, as well as a certificate of [sign] translation.")

She has "an associate's degree in sign language interpreting from the University of Akron ...[,] a bachelor's degree in technical education, teaching adults, from [the] University of Akron[,][a]nd ... a masters degree from Howard University in intercultural communication." She took specialized training from an attorney, a certified interpreter, showing how to give *Miranda* warnings in sign language. Ms. Ressler indicated that she had provided interpretation services in the trial court prior to serving as an interpreter for Mr. Mesa.

Before initiating a substantive conversation with Mr. Mesa on February 12, 2001, Detective Reed gave him a "waiver form" which allowed the detectives "to converse with [him] without the use of a court interpreter." She "let him read that waiver form as opposed to hav[ing] the interpreters interpret while [she] read." The form, which had been drafted by the United States Attorney's office, stated that Mr. Mesa had a constitutional right to have a qualified interpreter from the Office of Interpreter Services present, and it further explained that he could waive this right and agree to speak to the police using the two Gallaudet University interpreters who were present. Mr. Mesa read and signed the waiver form on February 12, 2001, at 2:25 p.m. Detective Reed tested Mr. Mesa's ability to "read, understand, [and] apply the right answers" by having him fill out "a hastily written questionnaire" which called for certain personal information (name, address, e-mail address, etc.). Mr. Mesa completed the questionnaire without any assistance and expressed no difficulty in understanding it.

As Detective Reed's interview with Mr. Mesa unfolded, he denied killing Mr. Varner, as well as receiving any money from him. Detective Reed asked Mr. Mesa whether he was willing to give a DNA sample. She had with her a form showing "voluntary consent to provide a DNA sample through a cheek swab." The detective "read [the form to Mr. Mesa] and had the interpreters interpret and then provided him the form and he signed [it at 3:05 p.m.] and agreed to give a DNA sample." Later on February 12, 2001, Mr. Mesa told Detective Reed that "he had remembered that Benjamin Varner had in fact g[i]v[en] him a check," and that the check "was for computer parts." Mr. Mesa also signed a waiver form granting permission to the police to take his fingerprints. Before he signed the form, Detective Reed "explained [it] to him through the interpreter and read [it] with the aid of the interpreter." After he signed the form, Mr. Mesa was taken to police headquarters without restraints by Detective Richmond; an interpreter accompanied them. Detective Reed remained behind to prepare a search warrant for Mr. Mesa's room. Mr. Mesa was fingerprinted, and the police took him back to Gallaudet after stopping for food.

The following day, February 13, 2001, Mr. Mesa approached Detective Richmond at Gallaudet's Department of Safety and Security ("DOSS") to inquire as to when he could return to his dormitory room. An interpreter was present. Detective Richmond responded that he did not know when Mr. Mesa could return to his room, and "asked him did he mind ... speaking with [him] in ... a more private area ..., and [Mr. Mesa] said that he didn't mind." The two went into an office. Also present in the office were two interpreters and another police officer. Detective Richmond asked whether Mr. Mesa had "any additional information on Benjamin Varner's murder." Mr. Mesa denied any involvement in the murder, and left the office.

Mr. Mesa had another contact with the police on February 13. Detective Reed

was standing outside Gallaudet's DOSS when she saw Mr. Mesa and Ms. de Guzman walking hand in hand. Ms. de Guzman had been crying. They entered the DOSS, and advised the clerk at the desk that Mr. Mesa desired "to tell the police something." Detective Reed, who had followed them into the DOSS, approached Mr. Mesa and Ms. de Guzman. Through interpreters who were on the scene, Mr. Mesa expressed a desire to "speak privately" and to have Detective Richmond present. When he was inside the interview room, in the presence of Detectives Reed and Richmond and two interpreters, and without any question having been posed, Mr. Mesa "said to the interpreters[, ']to be honest with you I did it.[']" He continued to talk without prompting from the detectives, saying that he was responsible for Mr. Varner's death, that he had gone to Mr. Varner's dormitory room, wearing the jacket which was later discovered in a dumpster; it was bloody. Mr. Mesa stated, "I used [a] knife and killed [Mr. Varner]." He also indicated that he stole and forged a check from Mr. Varner's room and later cashed the check. Detective Reed interrupted Mr. Varner to ask whether he would be willing to accompany her and other detectives to the police station, together with the interpreters, so that his statement could be videotaped. He agreed and was taken to Detective Reed's office at the Cold Case Squad at the main police headquarters, without restraints, in Detective Richmond's pickup truck.

While the police were setting up the videotape equipment in the interview room, "Mr. Mesa and his girlfriend ... conversed." Once the room was ready, those present were Detectives Reed and Richmond, the two interpreters and Mr. Mesa. Before questioning Mr. Mesa, Detective Reed gave him a "fresh" waiver form and "advised him of his rights." The interpreters explained the form and both Mr. Mesa and Detective Reed signed the form waiving his right to have a court interpreter present.[3] The interpreters, Ms. Ressler and Judith Beldon–Feldman,[4]

3. Before executing the waiver form, Mr. Mesa was informed that:

> The Constitution affords you certain rights; one of those rights is to have a qualified interpreter. The interpreter will come from the Office of Court Interpreters. And that interpreter is here, can be brought here, and that is your right to have that person as an interpreter. If you are willing to go ahead and answer questions, you need to understand that it is your right to have an interpreter from this Office of Interpreter Services, who has been qualified through that office.
>
> I have been informed of my rights to have a court-appointed interpreter and speak with the attorney .... I can have a lawyer. I can talk to an attorney. I can do that if I wish.
>
> I have two interpreters here, Carolyn Ressler, Judy Beldon–Feldman. I am waiving my right to have interpreters from the Office of Interpreter Services. I understand these interpreters clearly. I'm willing to go ahead and answer these questions with the two interpreters present; and there is no need to get interpreters from the Office of Interpreter Services.
>
> Before we ask questions we want to make sure that you understand your rights.

4. Ms. Beldon–Feldman began working as a full-time interpreter at Gallaudet in 1983. Her parents are deaf and she "learned to sign [American Sign Language] before [she] learned to speak English." She was trained formally in American Sign Language at the University of Akron and has an associate degree. She obtained "a comprehensive skills certification" from the Registry of Interpreters for the Deaf in 1985. Prior to assuming her position at Gallaudet she held other positions, and estimated that at the time of trial, she had had seventeen years of experience as an interpreter. She has also taught sign language. In addition, she received training in legal interpretation such as interpreting in civil depositions, and interpreting in law enforcement settings. She received training in interpreting *Miranda* warnings in January 1999.

acted as a team; one "would interpret what Mr. Mesa signed, [and the other] would interpret and sign what Mr. Mesa [said.]" Mr. Mesa also was given his *Miranda* warnings and elected to waive his rights by signing a PD–47 waiver form.[5] Following the execution of his PD–47 form, Mr. Mesa gave a videotaped statement confessing that he had killed Mr. Varner and Mr. Plunkett.

The trial court denied Mr. Mesa's motion to suppress, rejecting his arguments concerning the Interpreter Act and his *Miranda* rights. The court determined that the non-existence of the statutory Office of Interpreter Services "does not preclude a valid waiver" of rights under the Interpreter Act. The court further concluded that the statutory provision providing that "the waiver must be approved in writing, by the appointing authority," did not affect Mr. Mesa's situation. Specifically, the court declared that the provision "has no meaningful application in the context of a police interrogation." Rather, the court considered "the judicial officer with responsibility over the statement ...—if and when it's being used—to decide whether the waiver was properly made." That is, the trial court declared that it was "the appointing officer" for the purpose of deciding whether Mr. Mesa's waiver was valid under the Interpreter Act, and further, that "there is no requirement that in order for a waiver to be valid a person has to consult with a lawyer first." The court described Ms. Ressler and Ms. Beldon–Feldman as "highly qualified interpreters" and "highly skilled interpreters" "who spend their whole life interpreting." Hence, "there is no reason to, in any way, shape or form, question their competence."

Although two defense witnesses questioned the quality of the interpretation services provided by Ms. Ressler and Ms. Beldon–Feldman, the trial court found one witness, Mr. Arden Coulston, to be "either a wholly incredible witness, or ... simply not competent to make the interpretations, or he was doing some form of glossing that is irrelevant to any inquiry on the subject ...." With respect to the other defense witness, Ms. Betty Colonomos, the trial court "found her testimony generally to be credible," but did not "believe that any of the problems she had with the interpretation are either material or accurate." The court said that Ms. Ressler had the better vantage point since she was "doing" the interpretation and "making the facial expressions." Therefore, the court stated: "[L]ooking at the two of them I would find certainly that Ms. Ressler's interpretation of the precise word she was using was more accurate." Regarding Mr. Mesa's argument about the failure of the inter-

5. Mr. Mesa was informed as follows:

> Understand you don't have to answer questions. If you're asked questions, you do not have to answer them. If you answer questions, the information will be written down and videotaped; that information can be taken to court, and that may be used against you.
> It's your right to get an attorney. If you don't want to answer the questions—it's your right to have an attorney. You don't have to answer the questions that are asked of you. You may call an attorney to be with you and have them with you during the questioning.
> It's your right to get an attorney. You do not have to answer any questions until an attorney is here, if that's what you choose. Is it clear? So you're willing to answer questions? And if you are willing to answer questions that are asked of you, then please indicate so on this paper. If, perhaps later, as we're going along, you change your mind and you tell the detectives you want to stop, you no longer want to discuss this, you no longer want to answer questions, you may do so at any time; that is your right to stop. So if you answer yes now and later change your mind, you may do so; that is acceptable.

preter to use properly the word "waiver," the trial court stated: "The fact that the word 'waiver' was possibly not used in as explicit a fashion as it could, taken in context [it is] meaningless .... There is no requirement that the specific word 'waiver' be used." The context was that "Mr. Mesa said he wanted to get all this off his chest, and it was Mr. Mesa who affirmatively wanted to speak to the police ...." In summarizing its rather lengthy treatment of the Interpreter Act and *Miranda* arguments made by Mr. Mesa, the trial court asserted: "I would find that the police did everything that could have been done, that could have been expected from them both under the [Interpreter] [A]ct [and] under *Miranda* in this case; that the defendant was given all of his rights, that he waived those rights, and that his statements and waiver were knowing, intelligent and voluntarily [made] in all respects."

***Standard of Review***

In reviewing the denial of a motion to suppress evidence, "[w]e must accept the trial judge's findings of evidentiary fact and his resolution of conflicting testimony." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) (citing *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989)). At the same time, with respect to constitutional and other legal issues on which the denial of the suppression motion is based, our review is *de novo.* *See Castellon v. United States,* 864 A.2d 141, 148 (D.C.2004) (citing *Lyons v. United States,* 833 A.2d 481, 485 (D.C.2003)) (other citation omitted); *see also* D.C.Code § 17–305 (2001). Where the legal issue involves the interpretation of a statute, we look to applicable principles of statutory interpretation. We summarized significant statutory interpretation principles in *Boyle v. Giral,* 820 A.2d 561, 568 (D.C. 2003):

> We look to the plain meaning of a statute first, construing words according to their ordinary meaning. *See J. Parreco & Son v. Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989). "The literal words of [a] statute, however, are 'not the sole index to legislative intent,' but rather, are 'to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.'" *District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999) (quoting *Metzler v. Edwards,* 53 A.2d 42, 44 (D.C.1947) (footnotes omitted) (other citations omitted)). Furthermore, "'if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them ....'" *Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992) (quoting *United States v. Freeman,* 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845) (other citations omitted)). If related statutes conflict, we must reconcile them. *See Gonzalez v. United States,* 498 A.2d 1172, 1174 (D.C.1985).

Furthermore, "[i]n appropriate cases, we also consult the legislative history of a statute." *Abadie v. District of Columbia Contract Appeals Bd.,* 843 A.2d 738, 742 (D.C.2004) (citing *Kelly v. District of Columbia,* 765 A.2d 976, 978 (D.C.2001)).

***The Interpreter Act Issue***

We first dispose of Mr. Mesa's argument that because the Office of Interpreter Services, authorized in D.C.Code § 2–1911 (2001),[6] has not been established,

6. D.C.Code § 2–1911(a) provides: "There is established an Office of Interpreter Services ('Office') to facilitate the use of interpreters in administrative, judicial, and legislative proceedings in the District of Columbia." Sections 2–1911(b), (c), and (d) spell out the

no qualified interpreter could be provided, and hence, his motion to suppress his statements should have been granted. D.C.Code § 2–1901(5) defines "Qualified interpreter" as "a person who is listed by the Office of Interpreter Services as being skilled in the language or form of communication needed to communicate accurately with a communication-impaired person and who is able to translate information to and from the communication-impaired person." While it is true, as we recognized in *Ko, supra,* that the statutory central and government-wide Office of Interpreter Services does not exist, there is a functionally equivalent D.C. Courts' Office of Court Interpreting Services ("OCIS") with respect to the work of the D.C. Courts. Under statutory interpretation principles, "a court may refuse to adhere strictly to the plain wording of a statute in order 'to effectuate the legislative purpose,' as determined by a reading of the legislative history or by an examination of the statute as a whole." *Carter v. State Farm Mut. Auto. Ins. Co.,* 808 A.2d 466, 471 (D.C. 2002). The legislative history shows that the statutory Office of Interpreter Services was envisioned as "the central location in the District government for coordinating interpreter services." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, REPORT ON BILL 7–108, INTERPRETERS FOR HEARING IMPAIRED AND NON–ENGLISH SPEAKING PERSONS ACT OF 1987, June 11, 1987 ("Council Report"), at 4. But, to achieve the pivotal purpose of providing competent interpreter services, the Council also recognized that the D.C. Courts might need "a supplementary interpreter service program," [7] or, as it specified in D.C.Code § 2–1911(c)(1), it might be "impractical [ ] to request the assistance of the Office in locating a qualified interpreter." [8] Indeed, in approving the Act, the Council's overriding purpose was "to provide for qualified interpreters to assist hearing impaired and non-English speaking persons as they participate in proceedings of the D.C. Court System, the Council of the District of Columbia, and the District's administrative agencies." Council Report, at 1. Here, the record reveals that resort to the D.C. Courts' OCIS was unnecessary because the police and Gallaudet collaborated to ensure competent sign language interpreter services for Mr. Mesa before he was arrested. Nevertheless, we agree with the trial court that the existence or non-existence of the statutory Office of Interpreter Services is irrelevant to the ultimate statutory issue in this case.

Mr. Mesa's major challenge is to his alleged waiver of rights under the Act. Essentially he claims that his waiver was not valid because it "was not approved by an appointing authority," within the meaning of the Interpreter Act. Our resolution

"duties and responsibilities of the Office," procedures to obtain the services of an interpreter, and the contracting authority of the Office.

7. The Council Report stated: "To the greatest extent possible, the new Office should have administrative, legal, and overall program responsibility for interpreter services. It may be necessary, however, that an agency such as the D.C. Courts, which has especially heavy off-hours and emergency needs, will need to have a supplementary interpreter service program which is coordinated with the new office." Council Report, at 4.

8. D.C.Code § *2–1911(c)(1)* specifies in part: "If the circumstances are such that the appointing authority is unable, or it is impractical, to request the assistance of the Office in locating a qualified interpreter, the appointing authority may arrange for and appoint a qualified interpreter whose name is included on a list of interpreters maintained by the Office."

of this challenge requires us to reconcile related parts of the Act, *Gonzalez, supra,* 498 A.2d at 1174, and to read the words of the various parts of the Act "in the light of the statute as a whole," *Gallagher, supra,* 734 A.2d at 1091. Here, we must read § 2–1902(e) together with pertinent parts of §§ 2–1902(a), (b), (c), and (d), and with § 2–1906, all in light of the statute as a whole. Section 2–1902(e) provides:

> Whenever a communication-impaired person is arrested and taken into custody for an alleged violation of a criminal law, the arresting officer shall procure a qualified interpreter for any custodial interrogation, warning, notification of rights, or taking of a statement. No person who has been arrested but who is otherwise eligible for release shall be held in custody pending arrival of an interpreter. No answer, statement, or admission, written or oral, made by a communication-impaired person in reply to a question of a law-enforcement officer in any criminal or delinquency proceeding may be used against that communication-impaired person unless either the answer, statement, or admission was made or elicited through a qualified interpreter and was made knowingly, voluntarily, and intelligently or, in the case of a waiver, unless the court makes a special finding upon proof by a preponderance of the evidence that the answer, statement, or admission made by the communication-impaired person was made knowingly, voluntarily, and intelligently.

D.C.Code § 2–1906(a) specifies:

> (a) A communication-impaired person entitled to the services of an interpreter under this chapter may waive the services of a qualified interpreter in whole or in part. The waiver must be made in writing, or orally on the record, by the communication-impaired person following consultation with that person's attorney. If the person does not have an attorney, the waiver must be made in writing by the communication-impaired person in that person's written language and the waiver must be approved in writing, by the appointing authority.

The first sentence of § 2–1902(e) reveals that this section applies to a communication-impaired person who has been "arrested and taken into custody for an alleged violation of a criminal law." Under those circumstances, the section imposes on "the arresting officer" the responsibility for obtaining "a qualified interpreter for any custodial interrogation, warning, notification of rights, or taking of a statement." § 2–1902(e). In contrast, § 2–1902(a) applies to a communication-impaired person who is "a party or witness" or to "a juvenile whose parent or parents are communication-impaired," and to "a judicial or quasi-judicial proceeding," that is, a "court proceeding[ ]." D.C.Code § 2–1902(a);[9] Council Report, at 7. In that instance, it is "the appointing authority"

9. Section 2–1902(a) provides:

> Whenever a communication-impaired person is a party or witness, or whenever a juvenile whose parent or parents are communication-impaired is brought before a court at any stage of a judicial or quasi-judicial proceeding before a division or office of a court of the District of Columbia, including, but not limited to, civil and criminal court proceedings, proceedings before a commissioner, juvenile proceedings, child support and paternity proceedings, and mental health commitment proceedings, the appointing authority may appoint a qualified interpreter to interpret the proceedings to the communication-impaired person and to interpret the communication-impaired person's testimony. The appointing authority shall appoint a qualified interpreter upon the request of the communication-impaired person.

who has the responsibility for appointing a qualified interpreter. § 2–1902(a). Similarly, under section (c),[10] when "a communication-impaired person is a party or a witness in an administrative proceeding before a department, board, commission, agency, or licensing authority of the District of Columbia," the responsibility for appointing a qualified interpreter falls on the person "conducting the proceeding." § 2–1902(c). And, if a person is "a witness before any legislative committee," the "appointing authority" is the person "conducting the proceeding." D.C.Code § 2–1902(d).[11]

Unlike subsections (a), (b), (c), and (d), subsection (e) includes waiver language and assigns responsibility to "the court" for determining whether an "answer, statement or admission made by the communication-impaired person was made knowingly, voluntarily, and intelligently."[12] The last part of subsection (e) focuses on the use "in any criminal or delinquency proceeding" of an "answer, statement, or admission" or any attempt to assert a communication-impaired person's waiver of the right to a qualified interpreter. Thus, the reference to "the court" in that setting is significant and understandable in relation to D.C.Code § 2–1906(a).

Under § 2–1906(a), a communication-impaired person may waive his or her right to a qualified interpreter. If the communication-impaired person does not have an attorney at the time the waiver is made, as in the case before us, the waiver must be in writing, "and the waiver must be approved in writing, by the appointing authority." *Id.*[13] Properly interpreted, the

**10.** Section 2–1902(c) specifies:

> Whenever a communication-impaired person is a party or a witness in an administrative proceeding before a department, board, commission, agency or licensing authority of the District of Columbia, the appointing authority conducting the proceeding may appoint a qualified interpreter to interpret the proceedings to the communication-impaired person and to interpret the communication-impaired person's testimony. The appointing authority shall appoint a qualified interpreter upon the request of the communication-impaired person.

**11.** Section 2–1902(d) states:

> Whenever a communication-impaired person is a witness before any legislative committee, the appointing authority conducting the proceeding may appoint a qualified interpreter to interpret the proceedings to the communication-impaired person and to interpret the communication-impaired person's testimony. The appointing authority shall appoint a qualified interpreter upon the request of the communication-impaired person.

Section 2–1902(b) concerns a situation in which counsel has been appointed, and is more general than the other subsections. It is stated in the passive voice and does not use the term "appointing authority": "In any criminal, delinquency, or child neglect proceeding in which counsel has been appointed to represent an indigent defendant who is communication-impaired, a qualified interpreter shall be appointed to assist in communication with counsel in all phases of the preparation and presentation of the case."

**12.** The pertinent part of D.C.Code § 2–1902(e) states:

> No answer, statement, or admission, written or oral, made by a communication-impaired person in reply to a question of a law-enforcement officer in any criminal or delinquency proceeding may be used against that communication-impaired person unless either the answer, statement, or admission was made or elicited through a qualified interpreter and was made knowingly, voluntarily, and intelligently or, in the case of a waiver, unless the court makes a special finding upon proof by a preponderance of the evidence that the answer, statement, or admission made by the communication-impaired person was made knowingly, voluntarily, and intelligently.

**13.** Contrary to a suggestion in Mr. Mesa's brief, § 2–1906(a) provides the right to consult with an attorney only to a person who in fact has counsel; the statute confers no right to appointment of counsel in connection with

reference to "the appointing authority" in § 2–1906(a) parallels the reference to "the court" in § 2–1902(e), that is, it refers to the judge who handles the judicial proceeding.[14]

After reviewing the pertinent provisions of the Interpreter Act and the record, we are satisfied that the trial court did not err in its interpretation of the Act, and in concluding that Mr. Mesa waived his right to a qualified interpreter. In *Barrera v. United States,* 599 A.2d 1119 (D.C.1991), we emphasized that "[t]he goal of the Act is to create an independent right to an interpreter 'in th[e] situation of custodial interrogation [when] *Miranda* [ ] rights and the right to due process come into effect.'" *Id.* at 1131. To achieve this goal, "[t]he statute grants to any person who does not speak English [or who is deaf] and is taken into custody and questioned by the police the unrestricted right to a qualified interpreter." *Id.* at 1130. Mr. Mesa was not in a "situation of custodial interrogation" on February 12, 2001, and he made no incriminating statement. Nevertheless, as we said in *Barrera,* the Act allowed Mr. Mesa to waive any right to a qualified interpreter that he may have had on February 12, 2001, without a lawyer, so long as the waiver is in writing.[15] 599 A.2d at 1131. In that respect, even assuming that Mr. Mesa had a right to a qualified interpreter on February 12, 2001, he duly waived that right.

Before the detectives spoke with Mr. Mesa on February 12, 2001, Detective Reed gave him a waiver form pertaining to his right to a qualified interpreter. He read the form, and expressed no difficulty in understanding it. Two full-time skilled and competent interpreters employed by Gallaudet University were present. Mr. Mesa knowingly, intelligently and voluntarily signed the waiver form. Detective Reed tested Mr. Mesa's knowledge of English through a questionnaire she devised which called for certain personal information.[16] Mr. Mesa makes no claim that he is unable to read. He knowingly, intelligently and voluntarily signed two other waiver forms on February 12, 2001—one

a waiver. Nor does Mr. Mesa argue (and he could not properly do so) that the Sixth Amendment gave him a right to counsel at the time his waiver was made.

14. D.C.Code § 2–1901(1) defines "appointing authority" as "the presiding judge of any court of the District of Columbia." Mr. Mesa's suggestion that "appointing authority" refers to the Chief Judge of the Superior Court is inconsistent with the focus on a judicial or quasi-judicial proceeding, and the person who presides over that proceeding. Indeed there is a catchall phrase in § 2–1901(1) which is inconsistent with the notion that "appointing authority" refers to the Chief Judge of the Superior Court. The catchall phrase is: "or any other person presiding at any hearing or other proceeding in which a qualified interpreter is required." This catchall phrase, then, refers to the judicial officer who actually presides over a case, not to the Chief Judge who plays a role in administering the affairs of the Superior Court.

15. The Council Report on the Act states:

> Section 3(e) provides for a waiver of the right to an interpreter. The standard for waiving this right follows the currently accepted standard for waiver of *Miranda* rights. That is, a communication-impaired person may waive his or her right to a qualified interpreter, using a qualified interpreter, so long as the waiver is made knowingly, voluntarily and intelligently. Or, a communication-impaired person may waive his or her right to a qualified interpreter *without* the assistance of a qualified interpreter but, as with the waiver of *Miranda* rights, the burden of proof for determining voluntariness is the finding by the court of a preponderance of evidence.

*Id.* at 3.

16. The letters which Mr. Mesa wrote to Ms. de Guzman, and which were admitted into evidence reflect his decisive command of the English language.

giving the police permission to take a DNA sample, and the other to take his fingerprints. He signed the last two forms after Detective Reed read the forms to him and also explained the forms to him orally through American Sign Language interpreters. After reviewing the record of proceedings on February 12, 2001, we agree with the trial court that Mr. Mesa knowingly, intelligently and voluntarily waived his right to a qualified interpreter under the Interpreter Act.

On February 13, 2001, Mr. Mesa voluntarily approached the police on two different occasions—once to inquire about *when he could return to his room.* He made no incriminating statement at that time. His second voluntary contact with the police on February 13, 2001, resulted from his desire "to tell the police something." No questions had been posed to Mr. Mesa when he blurted out to the interpreters who were present, "to be honest with you I did it." He continued to speak voluntarily until Detective Reed cut him off to ask whether he was willing to go to the police station, together with the two interpreters from Gallaudet University, so that his statement could be videotaped. He agreed and was taken to police headquarters without restraint. There, he was given a fresh waiver of qualified interpreter form. The two highly experienced and trained interpreters, Ms. Ressler and Ms. Beldon-Feldman (both were also trained in signing *Miranda* rights), who had been full-time Gallaudet employees for several years, provided interpretation services as the detectives explained the form to him.[17] Mr. Mesa signed the form.

We agree with the trial court that on February 13, 2001, Mr. Mesa not only waived his right to a qualified interpreter, that is, one appointed by the court, but significantly, he had competent and highly skilled interpreters to assist him on that date. "[T]he determination of the competence of an interpreter is a matter entrusted to the sound discretion of the trial court, and its decision will not be disturbed on appeal unless that discretion has been abused." *Gonzalez v. United States,* 697 A.2d 819, 825 (D.C.1997) (citations omitted). On this record we see no abuse of discretion and "no indication of translator incompetence," *id.,* despite the testimony of defense witness Coulston whom the trial court discredited, and defense witness Colonomos whose testimony was not deemed to raise "material" problems. Consequently, Mr. Mesa cannot prevail on his argument that his motion to suppress should have been granted because the trial court violated the Interpreter Act.

***The Miranda Issue***

"In *Miranda,* the Supreme Court established that statements made by an accused while in police custody are inadmissible ... unless the police prior to questioning, warn him that he '... has the right to the presence of an attorney ...' " *Di Giovanni v. United States,* 810 A.2d 887, 891 (D.C.2002) (quoting *In re M.A.C.,* 761 A.2d 32, 35 (D.C.2000)). The warnings also include the right to terminate questioning if an accused desires to speak with an attorney after initially agreeing to waive that right. *Id.* Moreover, although "the accused may waive his rights provided by *Miranda* and provide a statement to the police, '[w]hen a defendant challenges the admissibility of such a statement, the government has the burden of proving that

17. Nothing in the record supports Mr. Mesa's contention that Ms. Ressler and Ms. Beldon-Feldman were paid by the MPD. In fact, Ms. Beldon-Feldman testified at trial that she submitted a time sheet to Gallaudet for the time she provided interpretation services to Mr. Mesa.

the waivers of privilege against self-incrimination and the right to counsel were made knowingly, intelligently, and voluntarily.' " *Id.* at 892. (quoting *In re M.A.C., supra,* 761 A.2d at 36). "Thus, the government bears a heavy burden to show: (a) that the defendant understood that in fact he had a right to the presence of counsel during an interrogation, ... and (b) that the defendant intentionally relinquished or abandoned that 'known right.' " *Id.* (quoting *Shreeves v. United States,* 395 A.2d 774, 778 (D.C.1978)). To determine whether the government has satisfied its heavy burden, we look to the totality of the circumstances. *Id.*

After examining the "particular facts and circumstances surrounding [Mr. Mesa's] case," *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (citations omitted), and "the totality of the circumstances," *Di Giovanni, supra,* 810 A.2d at 892, reflected in the record before us, we are confident that Mr. Mesa was instructed properly regarding his *Miranda* rights, that he understood he had a right to an attorney during the police interrogation, and that he intentionally chose to waive this right and to continue the interrogation without the help of counsel. As the trial court found, Mr. Mesa approached the police because he wanted to "get [something] off his chest." He was given his full *Miranda* rights at police headquarters through skilled full-time Gallaudet interpreters trained in giving *Miranda* rights in American Sign Language. He was a college student, who readily understood English, and he waived his *Miranda* rights by knowingly, intelligently and voluntarily signing a PD-47 waiver form. Therefore, the trial court did not err in rejecting Mr. Mesa's *Miranda* argument and in denying his motion to suppress.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[18]

*So ordered.*

18. Mr. Mesa argues that the trial court erred by not vacating two counts of felony murder while armed due to the merger of counts. The trial court noted in its July 10, 2002 sentencing, however, that "Cts E, F, L, M (Felony Murder Cts) to be vacated as merged after all appeal rights exhausted." Since, the trial court has indicated how the merger issue will be resolved following this appeal, we remand solely for that purpose.