Gregory D. **LINDSEY** and Maurice R. Gayles, Appellants,

v.

**UNITED STATES, Appellee.**

Nos. 99–CF–1295, 99–CF–1670, 03– CO–1283 and 03–CO–1286.

District of Columbia Court of Appeals.

Argued April 7, 2006.

Decided Nov. 30, 2006.

Judith A. Lovelace, appointed by this court, for appellant Lindsey.

Thomas T. Heslep, Washington, DC, appointed by this court, for appellant Gayles.

Katherine M. Kelly, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Carolyn K. Kolben, John J. Soroka, and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief for appellee.

Before WASHINGTON, Chief Judge, and KRAMER, Associate Judge and SCHWELB *, Senior Judge.

KRAMER, Associate Judge:

The appellants, Gregory Lindsey and Marcus Gayles, both challenge their convictions of first-degree murder while armed, possession of a firearm during a crime of violence (PFCOV) and carrying a pistol without a license (CPWL) following a jury trial. Appellant Lindsey claims that his conviction should be reversed because the trial court denied his motion to sup-

press his confession. Appellant Gayles challenges his convictions based on the trial court's denial of his motion to sever, the denial of his motion for a mistrial based on the government's belated discovery disclosures and the trial court's decision to disallow two defense witnesses from testifying. The appellants together also argue that the trial court erred in denying their joint post-conviction motion to vacate sentence, filed pursuant to D.C.Code § 23–110 (2001). We conclude that none of the claims raised on appeal justifies reversal of the appellants' convictions and therefore affirm.

## FACTUAL BACKGROUND

On August 4, 1998, Lindsey and Gayles were charged with four offenses in the same indictment: conspiracy to commit murder, first-degree premeditated murder while armed, PFCOV and CPWL. These charges stemmed from a shooting that occurred at approximately 4:00 a.m. on February 23, 1992, in the 600 block of Morton Street, Northwest. The decedent, Russell Johnson, was shot twenty-three times and died from the gunshot wounds. Several eyewitnesses identified the appellants as the shooters.

Lindsey was first arrested in connection with the Johnson murder in 1992. At that time, he was informed of his *Miranda* rights and signed a PD–47 form indicating that he was not willing to talk to police without an attorney present. After several months, during which Lindsey was detained, the government dismissed the charges against him.

Lindsey was arrested again in May 1994 on drug charges. He agreed to cooperate with law enforcement agents and pleaded

---

* Judge Schwelb was an Associate Judge at the time of argument. His status changed to Senior Judge on June 24, 2006.

guilty in the U.S. District Court for the District of Columbia to distribution of cocaine pursuant to a plea agreement. Until his sentencing about a year later, Lindsey continued to cooperate with law enforcement authorities, particularly with Bureau of Alcohol, Tobacco and Firearms Special Agent Frank Haera and D.C. Metropolitan Police Detective Anthony Brigidini, in the ongoing investigation of criminal activity in the Park Morton neighborhood.[1]

In August 1997, Agent Haera and Detective Brigidini visited Lindsey at the Federal Correctional Institute located in Cumberland, Maryland, where he was serving his sentence on the cocaine distribution charge. Cumberland is a minimum security facility and Lindsey was in a work-release program. Lindsey was summoned by an intercom while taking a GED test to meet with the officers. He was directed to a conference room with a window, a long table and several chairs. After some initial pleasantries, the officers told Lindsey that they had new evidence relating to the Johnson murder and that they believed he was involved. They provided "a detailed synopsis" of the events before, during and after the murder, including Gayles' involvement and the motive for the murder. The agents did not read Lindsey his *Miranda* rights, but they notified him that he was not under arrest and did not have to talk to them about the murder. They did indicate, however, that they wanted him to cooperate with them on a new drug investigation and that it could be easier on him if he assisted in the investigation.

Lindsey confessed to killing Johnson and also implicated Gayles in the course of his confession. He also told them that the murder was the result of a "drug-related situation with a person" named Ray Proc-

tor. After Lindsey indicated that he would cooperate in the new Park Morton area investigation, the agents told him they would inform the prosecutor and return with a defense attorney to try to reach a plea agreement.

Several months later, Lindsey was arrested for the murder while still serving his sentence in the Cumberland facility and was subsequently indicted. Thereafter, he filed a pretrial motion to suppress his confession, which was denied after a three-day hearing. In denying the motion, the trial court stated: "I don't believe that based on the hearings we have had in this case that I can find he was in custody." The court went on to rule, "I think once the [c]ourt concludes he's not in custody the only basis to suppress these statements he made would be based on voluntariness. And I don't even think it's a close question with regard to voluntariness here. It's clear to me that these statements were voluntary."

Appellant Gayles filed a pretrial motion to sever the trials based upon the expectation that Lindsey's confession, implicating Gayles, would be admitted into evidence. This motion was also denied, and the trial court explained: "To admit [Lindsey's] statement under these circumstances ... would ... violate in a very fundamental way Mr. Gayles' confrontation rights by depriving him of the right to cross-examine the accuser of these statements." Thus, the court required the government "to redact in a full and complete way any reference or inferential reference to Mr. Gayles" in Lindsey's statement as a condition of its admission at trial.

The trial was held over a six-day period. The government called eleven witnesses, including four eyewitnesses: David Hooks,

---

1. The Park Morton neighborhood is located in the 600 block of Morton Street, Northwest, the same area where the decedent was murdered.

Uniqua Watson, Alfreda Hamilton and Kevin Perry. All of the government's eye-witnesses were impeached with bias evidence. Detective Brigidini also testified at trial about Lindsey's confession. At the conclusion of the government's case, the court granted defense counsels' motions for judgment of acquittal on the conspiracy charges.

Neither Lindsey nor Gayles called any defense witnesses, though Gayles' counsel proffered two witnesses. The first witness was Ray Proctor, the alleged target of the appellants' conspiracy to commit murder. Gayles' counsel indicated that he intended to call Mr. Proctor to testify for the defense regarding his knowledge of the alleged conspiracy. After the government indicated it would cross-examine Proctor about other crimes and the court made extensive inquiry, the court ruled that his Fifth Amendment right overrode Gayles' desire to call him as a witness.

The second witness Gayles sought to call was Cherry Jones, the complainant in the kidnaping case against Kevin Perry, who was an eyewitness to the Johnson murder. The government had dismissed the kidnaping case pursuant to a plea agreement. The court disallowed this testimony on the grounds that it was collateral but granted Lindsey's request to take judicial notice of the facts from the *Gerstein* filing in the kidnaping case.

After the closing arguments and jury instructions, the case was submitted to the jury, which that same day returned guilty verdicts on the charges of first-degree premeditated murder, PFCOV and CPWL. Lindsey was sentenced to twenty years to life for first-degree murder, five to fifteen years for PFCOV and twenty months to five years for CPWL, all to run consecutively. Gayles was sentenced to twenty years to life for first-degree murder, five to fifteen years for PFCOV, to run consec-

utively, and one year for the CPWL, to run concurrently with the others. They both filed appeals from their convictions.

Approximately three years after his sentencing, Gayles filed a post-conviction motion to vacate sentence, and Lindsey was permitted to join that motion. The appellants alleged that the government had committed *Brady* violations by not disclosing the name of an exculpatory witness, Vanessa Anderson, prior to trial. Ms. Anderson submitted an affidavit claiming that Alfreda Hamilton, an eyewitness to the murder who testified at trial, could not have seen the crime from where she was standing during its commission, that is, on the balcony of Ms. Anderson's apartment. Ms. Anderson also stated that she had provided the government with this information prior to trial. After a hearing, the trial court denied the appellants' motion to vacate, finding that Ms. Anderson's testimony was not credible. Lindsey and Gayles appealed that ruling, and the matter has been consolidated with their direct appeals for our review.

### APPELLANT LINDSEY'S
### ISSUES ON APPEAL

We first turn to Lindsey's claim that his confession was admitted in violation of his Fifth and Sixth Amendment rights. In reviewing the trial court's denial of the motion to suppress, we "view the evidence in the light most favorable to the prevailing party, and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Castellon v. United States*, 864 A.2d 141, 148 (D.C.2004) (quoting *Gatlin v. United States*, 833 A.2d 995, 1005 (D.C.2003)). In addition, we "must accept the trial judge's findings of evidentiary fact and [her] resolution of conflicting testimony," but we review legal determinations *de novo. Mesa v. United States*, 875 A.2d 79, 89 (D.C.

2005) (quoting *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991)).

### Lindsey's *Miranda* Argument

First, Lindsey argues that the admission of his confession violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because Agent Haera and Detective Brigidini did not inform him of his Fifth Amendment rights, as required by *Miranda,* despite the fact that he was in custody at the Maryland Correctional Institution at the time the confession was taken. In *Miranda,* the Supreme Court established law enforcement procedures in order to protect a suspect's Fifth Amendment privilege against self-incrimination, holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. 1602. One of those safeguards is the well-known litany of rights set out in *Miranda* that must be given to a suspect who is about to undergo "custodial interrogation."[2] The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* In determining whether a suspect is in custody, we have stated:

> The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.... The test is whether under all of the circum-

stances a "reasonable man" innocent of any crime would have thought he was not free to leave.

*Griffin v. United States,* 878 A.2d 1195, 1198 (D.C.2005) (citations and internal quotation marks omitted); *see In re I.J.,* 906 A.2d 249, 255–56 (D.C.2006) (" 'Custody,' for *Miranda* purposes, is present when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' As the court has explained ..., 'given [the] circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " (citations omitted)), *vacating and amending* 884 A.2d 611 (D.C.2005). Stated another way, "The test for determining whether a person is in custody is an objective one and focuses upon how a reasonable [person] in the suspect's position would have understood [his or her] situation. The inquiry is based [upon looking at] the totality of the circumstances." *United States v. Turner,* 761 A.2d 845, 851 (D.C.2000) (footnote, citations, and internal quotation marks omitted).

When a suspect is incarcerated on other charges at the time of interrogation, the *Miranda* "in custody" analysis is somewhat different from the classic interrogation of the suspect at the police station. Although we have recognized that there is a question about whether an inmate is " 'in custody' for *Miranda* purposes merely because of his status as a prisoner," *Smith v. United States,* 586 A.2d 684, 685 (D.C. 1991), we have never decided this issue.

Lindsey argues that *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20

---

**2.** That litany includes advising the person in custody that (1) he or she has a right to remain silent; (2) any statement may be used as evidence against him or her; (3) he or she is entitled to consult with an attorney; (4) an attorney will be appointed if the person can-

not afford to retain one; and (5) he or she may exercise any of these rights at any point during the interrogation. *See generally Miranda, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

L.Ed.2d 381 (1968), established that prisoners are always considered in custody under *Miranda,* and that *Mathis* thus controls the outcome of this appeal. We do not agree. In *Mathis,* the Supreme Court rejected the government's argument that *Miranda* applies "only to questioning one who is 'in custody' in connection with the *very case* under investigation." *Id.* at 4, 88 S.Ct. 1503 (emphasis added). The Court found "nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given [to] persons under interrogation by officers based on the reason why the person is in custody." *Id.* at 4–5, 88 S.Ct. 1503. This holding falls short of establishing that *Miranda* warnings must be given every time a prisoner is questioned regarding an ongoing criminal investigation or that a prisoner is *per se* in custody for *Miranda* purposes.

In fact, the interpretation of *Mathis* espoused by Lindsey in this case has been repeatedly rejected by other state and federal courts. For example, in *Cervantes v. Walker,* 589 F.2d 424 (9th Cir.1978), the Ninth Circuit held:

> In the prison situation, [custody] necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.

*Id.* at 428. In so holding, *Cervantes* identified four factors that are relevant to the determination of whether a prisoner is "in custody" for *Miranda* purposes: "[1] the language used to summon the individual, [2] the physical surroundings of the interrogation, [3] the extent to which he is confronted with evidence of his guilt, and [4] the additional pressure exerted to detain him." *Id.* at 428. Most jurisdictions that have considered this issue have adopted standards similar to the one established in *Cervantes.*[3] Because we find

---

**3.** *See Garcia v. Singletary,* 13 F.3d 1487, 1492 (11th Cir.1994) ("In the context of questioning conducted in a prison setting, restricted freedom 'implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.'" (quoting *Cervantes, supra,* 589 F.2d at 428)), *cert. denied,* 513 U.S. 908, 115 S.Ct. 276, 130 L.Ed.2d 193 (1994); *Leviston v. Black,* 843 F.2d 302, 304 (8th Cir.1988) ("While *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation, incarceration does not *ipso facto* render an interrogation custodial." (citation omitted)), *cert. denied,* 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988); *United States v. Conley,* 779 F.2d 970, 973 (4th Cir.1985) ("[A] prison inmate is not automatically always in 'custody' within the meaning of *Miranda*."), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986); *United States v. Scalf,* 725 F.2d 1272, 1275–76 (10th Cir.1984) (holding that the District Court properly relied on *Cervantes, supra,* in holding that *Miranda* was not required for the prisoner-appellant in that case); *People v. Denison,* 918 P.2d 1114, 1116 (Colo.1996) ("A majority of jurisdictions ruling on the issue have adopted the *Cervantes* reasoning in determining whether an on-the-scene investigation has occurred when an inmate is questioned regarding an incident which occurs in a jail or prison while the inmate is housed in the facility."); *State v. Overby,* 249 Ga. 341, 290 S.E.2d 464, 465 (1982) ("[T]he mere fact that the accused already is in institutional custody ... does not of itself require the officers to refrain from all inquiry until those persons present at the scene have received proper *Miranda* warnings."); *State v. Smith,* 546 N.W.2d 916, 922 (Iowa 1996); *Commonwealth v. Larkin,* 429 Mass. 426, 708 N.E.2d 674, 680 (1999) ("The question ... is not whether a person is in custody in some abstract sense or for some other purpose, but whether he is in custody in the sense that implicates the concerns motivating the *Miranda* rule in the first place."); *State v. Tibiatowski,* 590 N.W.2d 305, 309 (Minn.1999) ("We hold that under the circumstances here where there is no evidence of restraint on the suspect's freedom other

the rationale of *Cervantes* and its progeny to be persuasive and the factors considered by those courts to be significant in determining whether an inmate being questioned is in custody for *Miranda* purposes, we now apply them to the facts of this case.

Application of the *Cervantes* factors to this case leads us to conclude that Lindsey was not in custody at the time of his prison confession. With respect to the first factor—the words used to summon him—Lindsey was paged to the administration building, told that he had visitors and was led by a prison employee to the conference room where Heara and Brigidini were waiting. The prison employee then left the area. Thus, the record shows that Lindsey was summoned to the meeting in the same way that all inmates are called to meet with visitors, and, therefore, there was nothing unusual that occurred in this case from which we could conclude that he was subjected to any greater restraint on his movement than any other inmate.

With respect to the second factor, the physical surroundings of the interrogation, the interview took place in a minimum security prison where Lindsey was free to move around with almost no restrictions. He was permitted to leave the facility daily for a work release program. The conference room where the interview took place had a window that faced outside, a long table with several chairs and the door to the room was left unlocked. Importantly, the agents instructed Lindsey that he was not under arrest, and that he did not have to speak with them. And the trial court made a specific factual finding that he was free to leave the interrogation at any time.

The third factor is the extent to which Lindsey was confronted with evidence of his guilt. The agents explained that they were visiting him regarding Johnson's murder and provided him with a detailed recounting of the events before, during and after the murder, including Gayles' involvement and the motive for the mur-

than that to which the suspect was already subject by reason of his custody for an unrelated offense, the suspect is not in custody for purposes of *Miranda*."); *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524, 540 (1990) ("[I]ncarceration does not *ipso facto* render an interrogation custodial ...." (quoting *Leviston, supra*, 843 F.2d at 304)), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *State v. Conley*, 574 N.W.2d 569, 573 (N.D. 1998) ("Incarceration does not automatically make an inmate in custody for *Miranda* purposes. Some added restriction on the inmate's freedom of movement during the interrogation itself must exist."); *State v. Simpson*, 2002 Ohio 3717 at ¶ 34, 2002 WL 1625559 (Ohio Ct.App.2002) ("[C]ourts require *Miranda* warnings if there is any 'change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.' The majority of Ohio courts that have addressed this issue have followed that reasoning." (quoting *Cervantes, supra*, 589 F.2d at 428) (citations omitted)); *Bradley v. State*, 316 S.C. 255, 449 S.E.2d 492, 493 (1994) ("While *Miranda* may apply to one who is in

custody on an unrelated offense, the mere fact that one is incarcerated does not render interrogation custodial." (citations omitted)); *Beamon v. Commonwealth*, 222 Va. 707, 284 S.E.2d 591, 592 (1981) ("Prisoners do not have greater Fifth Amendment rights than other persons."); *State v. Post*, 118 Wash.2d 596, 826 P.2d 172, 178–79 (1992); *see also* Laurie Magid, *Questioning the Question–Proof Inmate: Defining* Miranda *Custody for Incarcerated Suspects*, 58 Ohio St. L.J. 883, 935–36 (1997) ("After *Mathis*, numerous state and lower courts expressly held that not all incarceration constitutes *Miranda* custody and that 'incarceration does not ipso facto render an interrogation custodial.' ... [A] substantial number of both state and lower federal courts have expressly concluded that incarceration does not *per se* constitute *Miranda* custody."). *But see State v. Holt*, 132 Ohio App.3d 601, 725 N.E.2d 1155, 1158 (1997) (holding that *Miranda* warnings are always necessary when police question a defendant about an offense separate from that for which he or she is in custody) (citing *Mathis, supra*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)).

der. While they told him that it would be better if he cooperated, there was no discussion about his having an obligation to cooperate.

The fourth factor we consider is whether there was any additional pressure used to detain Lindsey or whether more restrictions were put upon him. The record shows there was no such effort, nor any "change in the surroundings ... which result[ed] in an added imposition on his freedom of movement." *Cervantes, supra,* 589 F.2d at 428. Not only was he not shackled or restrained in any way, no physical force whatsoever was used to get him to speak with the agents, nor to prevent him from terminating the interview and leaving the conference room. Thus, there is no reason to conclude that he perceived that he was in custody or that he was not free to leave if he wished, nor that any reasonable person in his position would have perceived that he was not free to leave.

Based on these factors, we are satisfied that there was no greater restriction placed on Lindsey's freedom of movement as a result of his interview than was normal under the circumstances of his incarceration and therefore, for purposes of *Miranda,* he was not in custody. Thus, the officers were not required to give him the *Miranda* warnings, and the trial court did not err in finding that his statement was admissible on these grounds.

### Lindsey's Involuntariness Argument

■ Lindsey next claims that his confession was given involuntarily, in abridgment of his Fifth Amendment right, and thus should not have been admitted on this alternative ground. "A statement is involuntary only if under the totality of the circumstances, the will of the suspect was overborne in such a way as to render his confession the product of coercion." *Cas-*

*tellon, supra,* 864 A.2d at 157 (citing *Turner, supra,* 761 A.2d at 854) (internal quotation marks omitted). The government bears the burden of proving whether a defendant's statement was voluntary, and the focus of this inquiry "is 'primarily upon the perceptions of the suspect, rather than the intent of the police,' " considering "the normally foreseeable effect of the officer's remark or conduct, keeping in mind any peculiar susceptibilities of the suspect then known to the police." *Hill v. United States,* 858 A.2d 435, 441–42 (D.C.2004) (citing *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

Lindsey claims that the circumstances under which he was questioned were coercive, particularly, he asserts, because he believed he was required to cooperate with the investigators and would be protected from prosecution for the Johnson murder by his previous plea agreement. We are unpersuaded by this argument.

■ The record shows that Lindsey did not ask the officers at any point whether his plea agreement could be vacated if he refused to speak with them, and neither of the officers told Lindsey this was the case. On the contrary, the officers testified that prior to Lindsey's confession, they told him that he did *not* have to talk to them. Furthermore, Lindsey's assertion that he was coerced based on his belief that the plea agreement required him to cooperate is belied by the evidence that he refused to discuss the Johnson murder when previously asked about it, at a time when he undoubtedly knew his plea agreement was in effect. In addition, immediately before his sentencing on the drug distribution charge, he was asked one last time if there were any other crimes about which he would like to inform the authorities, and he responded that there were none. Considering the totality of the circumstances ap-

parent in the record, we conclude that Lindsey's will was not overborne and, accepting for these purposes that he had a mistaken belief about the requirements of his plea agreement, that the mistaken belief did not render his confession involuntary. Indeed, we agree with the motions judge, who concluded that voluntariness was "not a close question" and that it was "clear ... that these statements were voluntary."[4]

### Lindsey's Right to Counsel Argument

Lindsey's third argument as to why his confession was improperly admitted at trial is that he had a Sixth Amendment right to counsel at the time that Heara and Brigidini interviewed him, and that because this right was infringed, it was error for the trial court to admit his confession at trial. We conclude that this argument is contrary to the clear preponderance of legal authority that has addressed the issue.

In *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the Supreme Court recognized that "[t]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Id.* at 176, 106 S.Ct. 477. The Court later held that the constitutional right to counsel "is triggered at or after the time that judicial proceedings have been initiated ... wheth-

er by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. United States*, 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)) (internal quotation marks omitted). In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Court determined that this right is "offense specific," and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." *Id.* at 175, 111 S.Ct. 2204; *see Sweet v. United States*, 756 A.2d 366, 377–78 (D.C.2000).

Judicial proceedings were not pending against Lindsey for the Johnson murder when Heara and Brigidini questioned him at the Maryland facility. Nonetheless, Lindsey argues that his right to counsel had previously attached in this case in 1992 when he was first arrested for the Johnson murder, and his right to counsel was still in effect when he was questioned again in connection with the same crime five years later. Whether a defendant's Sixth Amendment right to counsel survives the dismissal of a previous prosecution for the same criminal activity is another issue of first impression raised by this appeal, and we once again look to other jurisdictions for guidance.

An often cited case that addresses this issue is *United States v. Martinez*, 972

---

4. Lindsey also testified at the pretrial suppression hearing that the officers told him that anything he said would not be used against him, but the trial court made no findings regarding the credibility of this statement. Even if the officers did tell Lindsey that his statement would not be used against him, we cannot say that such an assertion would require a finding that the confession was coerced. *See Contee v. United States*, 667 A.2d 103, 104 (D.C.1995) ("Even when police have admittedly deceived a suspect, however, the test for admissibility is still the voluntari-

ness of the statement under the total circumstances.") (citing *Beasley v. United States*, 512 A.2d 1007, 1015–16 (D.C.1986), *cert. denied*, 482 U.S. 907, 107 S.Ct. 2485, 96 L.Ed.2d 377 (1987)). Given the strong record of voluntariness discussed above, and the totality of the circumstances in this case, including the fact that the appellant had worked with these officers and was very familiar with the criminal justice system, there is no basis to conclude that such a statement by the officers would have forced him into an involuntary confession.

F.2d 1100 (9th Cir.1992), where a defendant had first been charged with a particular crime in state court, thus triggering his right to counsel, those state charges were later dismissed, but federal authorities then questioned the defendant about the same crime outside of the presence of counsel. The Ninth Circuit held that the defendant's Sixth Amendment right was not re-triggered when he was questioned by the federal investigators:

> We are reluctant ... to extend [the application of the Sixth Amendment right to counsel] indefinitely into the future after the initial charge is dismissed.... Such a broad prophylactic application of the Sixth Amendment runs counter to the reasoning of *Moulton* and *McNeil,* which stressed both the narrow application of the Sixth Amendment right to counsel and the importance of allowing police to initiate and pursue investigations.

*Id.* at 1104–05. *Martinez* recognized, however, that this principle is not without its limits and that an appellant might well be entitled to suppression of his statements if the "government breached its affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Id.* at 1105 (quoting *United States v. Hines,* 963 F.2d 255, 258 (9th Cir.1992)) (internal quotation marks omitted).

Similarly, in *United States v. Mapp,* 170 F.3d 328, 334 (2d Cir.1999), *cert. denied,* 528 U.S. 901, 120 S.Ct. 239, 145 L.Ed.2d 200 (1999), the Second Circuit upheld the denial of a motion to suppress a statement under circumstances that are somewhat parallel to those here. Mapp had been charged with murder in state court, but the charge was dismissed. Four months later, federal prosecutors arranged for an informant, who was wired with a recorder, to speak with Mapp about the murder dismissed by the state. A few months thereafter, Mapp was indicted by the grand jury on the murder charge, and the tape of his conversation with the informant was introduced at this trial. Mapp claimed that the federal authorities had "created a seamless web of incarceration and prosecution" to avoid the attachment of his Sixth Amendment right to counsel. The court held there was no evidence that "state and federal authorities colluded to manipulate the timing of the dismissal and filing of charges in a manner calculated to deprive an individual of his right to counsel," *id.* at 334, and that the right to counsel that had attached when he was charged with murder by the state authorities did not survive the dismissal of those charges.

In *United States v. Montgomery,* 262 F.3d 233, 246–47 (4th Cir.2001), *cert. denied,* 534 U.S. 1034, 122 S.Ct. 576, 151 L.Ed.2d 448 (2001), the Fourth Circuit, confronted with a similar argument, wrote:

> Adoption of [the appellant's] argument would provide a once-indicted defendant with a permanent constitutional shield. Neither the Sixth Amendment nor the Supreme Court's explication of the rights guaranteed by it countenance such a result.... [M]ost courts to consider the question have refused to hold that "once a defendant has been charged," even after those charges are dismissed, the police and their agents are barred from questioning him "about the subject matter of those charges unless his counsel is present."

*Id.* (quoting *Mapp, supra,* 170 F.3d at 334); *see also United States v. Skipworth,* 697 F.2d 281, 283–84 (10th Cir.1983) (rejecting "defendant's theory that when [the] right to counsel attaches in a state prosecution it carries over to a subsequent federal investigation made after the dismissal of the state charges").

Several courts have also addressed this issue in the same context we have here, that is, where charges have been dismissed and re-brought by the same prosecutorial authority. *State ex rel. Sims v. Perry*, 204 W.Va. 625, 515 S.E.2d 582, 584 (1999), involved a defendant whose arson charges had been dismissed following a preliminary hearing "for lack of sufficient evidence to support the charges." Law enforcement officers obtained new information two years later, however, and recorded the defendant making incriminating statements. Based on this new evidence, the state prosecutor re-charged the defendant on the arson charges and used the recorded statements at trial against him. The Supreme Court of Appeals of West Virginia affirmed the defendant's convictions, concluding:

> [W]e hold that unless a criminal defendant can show that the government has obtained a dismissal of adversarial judicial criminal proceedings against him or her in order to circumvent his or her constitutional rights, once such criminal proceedings have been dismissed, the right to the assistance of counsel granted by the Sixth Amendment to the United States Constitution no longer applies, regardless of whether the defendant is represented by counsel.

*Id.* at 635, 515 S.E.2d 582.

In *Riggs v. Yukins*, 2001 WL 558241, at *1, 2001 U.S. Dist. Lexis 6760, at *2 (E.D.Mich. Mar. 13, 2001), the defendant's first-degree murder charge was dismissed after her preliminary hearing, where she was represented by counsel, due to the

judge's finding that there was insufficient evidence to sustain the charge. Several months later, however, the defendant was videotaped implicating herself in the murder to undercover officers, outside of the presence of counsel. State prosecutors then recharged the defendant with first-degree murder and introduced the videotaped statement at trial. *Id.* at *2, 2001 U.S. Dist. Lexis 6760 at *5. After her appeal was concluded, the defendant filed a writ of habeas corpus challenging her conviction. The U.S. District Court for the Eastern District of Michigan concluded that her Sixth Amendment right to counsel did not attach when she made her statement:

> [T]he right to counsel does not survive the dismissal of formal charges against an accused, at least when there is no deliberate attempt on the part of the prosecuting authorities to circumvent the Sixth Amendment right to counsel through the purposeful dismissal of pending charges and/or collusion between different sovereigns.

*Id.* at *11, 2001 U.S. Dist. Lexis 6760 at *33–34.[5]

■ We conclude that the analysis set forth in these cases is persuasive and therefore hold that after criminal charges have been dismissed, a defendant's Sixth Amendment right to counsel no longer adheres and must be reasserted in the absence of bad faith by the government. We are also satisfied that, as in *Martinez, Mapp* and *Perry*, there is no indication that the government was attempting to

---

**5.** *See also State v. Wyche*, 2002 Ohio 202, 2002 WL 77130 at *9, 2002 Ohio App. Lexis 165 at *26–27 (Ohio Ct.App.2002) ("[T]he Sixth Amendment right to counsel on a particular charge should not extend in perpetuity after a dismissal without prejudice. The continuation of the Sixth Amendment right after dismissal or *nolle prosequi* of the original charges is only warranted to protect against a

deliberate effort by government representatives to circumvent the Sixth Amendment rights of the accused by dismissing an original charge for the purpose of obtaining an incriminating statement to be used in a later prosecution against the same accused."). *But see State v. Frye*, 897 S.W.2d 324, 329–30 (Tex.Crim.App.1995).

circumvent and dilute Lindsey's right to counsel, particularly given the five year time gap between the dismissal of the murder charge and its reinstatement. For these reasons, we reject Lindsey's claim that his right to counsel was infringed when he confessed to the murder and affirm the trial court's denial of Lindsey's motion to suppress his confession to the Johnson murder.

## APPELLANT GAYLES' ISSUES ON APPEAL

### Gayles' *Bruton* Argument

■ We next turn to Gayles' separate challenges to his convictions. We address first his claim that although Lindsey's confession was redacted to remove any direct or inferential reference to Gayles, his Sixth Amendment Confrontation Clause rights were breached when the government impermissibly linked the confession with the other evidence against him in its rebuttal argument. Because Gayles did not object to the alleged misconduct at trial, we review for plain error the trial judge's failure to intervene sua sponte. *See, e.g., Adams v. United States,* 883 A.2d 76, 83; *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989).[6] In order to reverse, we must conclude that the error was "plain" (as in clear or obvious), that it "affected substantial rights," and that it "seriously affected the fairness, integrity or public reputation of [the] proceedings." *Beaner v. United States,* 845 A.2d 525, 539 (D.C. 2004) (quoting *Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001)).[7]

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant's Confrontation Clause rights are violated when "incriminating extrajudicial statements of a codefendant" are presented at trial and the defendant has no opportunity to cross-examine his co-defendant. *Id.* at 135–36, 88 S.Ct. 1620. The Court further held that this harm cannot be corrected by a curative jury instruction since the effect of such a statement is highly prejudicial. *Id.* at 132, 88 S.Ct. 1620. In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court refined the standard articulated in *Bruton,* stating that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. 1702.

■ In this case, the government argued in its rebuttal that "if Lindsey made that statement [to police], and [the four eyewitnesses] know these guys[, Lindsey and Gayles,] and they see them together all the time, and if Lindsey made—then they committed this murder in cold blood." Although this statement is troublesome under the *Bruton* and *Marsh* standards because it could be construed as linking Lindsey's statement to Gayles, we cannot find that it prejudiced the outcome of the trial. The government's objectionable comment was one relatively brief remark in a very long case; the trial went on for

**6.** Although a trial judge who has denied severance "has a continuing obligation to monitor for prejudice" from the joinder of defendants, *Sousa v. United States,* 400 A.2d 1036, 1041 (D.C.1979), that does not relieve defense counsel of the duty to make timely objection when events, such as the prosecutor's argument here, risk bringing about that prejudice.

**7.** The standard of review for prosecutorial misconduct is similar: we will "affirm a conviction unless the accused 'suffered substantial prejudice as a result of the [conduct].'" *West v. United States,* 866 A.2d 74, 81 (D.C. 2005) (quoting *Allen v. United States,* 649 A.2d 548, 555 (D.C.1994)).

over five days, spanning over a week and a half, and the prosecutor's summation and rebuttal alone covered over twenty-two pages of transcript in the record. Furthermore, Lindsey's confession was admitted into evidence without any direct or inferential reference to Gayles, and none of the witnesses testified in any way that impermissibly linked Gayles to Lindsey's confession. Given these circumstances, we conclude that the prosecutor's passing remark did not affect substantial rights or undermine the integrity of the trial, and we thus hold that the trial judge's failure to intervene was not plain error.[8]

### Gayles' Discovery Violations Argument

■ Gayles' second argument on appeal is that his convictions should be vacated because he was prejudiced by the government's failure to make timely and complete discovery disclosures under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Brady* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. In *Giglio,* the Supreme Court refined the *Brady* standard to include impeachment evidence, specifying that "[w]hen the 'reliability of a given witness may well be determinative of guilt

or innocence,' nondisclosure of evidence affecting credibility falls [under *Brady*]." 405 U.S. at 154, 92 S.Ct. 763 (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)); *see also Moore v. United States,* 846 A.2d 302, 305 n. 4 (D.C.2004) ("There is, of course, no 'difference between exculpatory and impeachment evidence' when it comes to the prosecutor's duty to disclose evidence favorable to the accused." (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995))).

■ The government must make *Brady/Giglio* disclosures "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." *Curry v. United States,* 658 A.2d 193, 197 (D.C.1995) (quoting *Edelen v. United States,* 627 A.2d 968, 970 (D.C.1993)). A conviction may be reversed for failure to provide this evidence "where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Edelen, supra,* 627 A.2d at 971, which means "a probability sufficient to undermine confidence in the outcome." *Sykes v. United States,* 897 A.2d 769, 777 (D.C.2006) (quoting *Ebron v. United States,* 838 A.2d 1140, 1155 (D.C.2003), *cert. denied,* 543 U.S. 939, 125 S.Ct. 347, 160 L.Ed.2d 247 (2004)); *see also Kyles, supra,* 514 U.S. at 434, 115 S.Ct. 1555 ("[A] showing of materiality does not require demonstration by a preponderance that

**8.** Gayles also argues that the trial court erred in denying his motion to sever on the grounds that Lindsey's confession was prejudicial to him at trial. Since the trial court redacted Lindsey's confession in accordance with *Bruton, supra,* the trial court did not abuse its discretion in denying the severance. *See Roy v. United States,* 871 A.2d 498, 503 (D.C.2005) ("We review the trial court's denial of appellants' motions to sever for abuse of discretion and will reverse only upon appellants' show-

ing that they suffered manifest prejudice by being tried jointly.") (citing *Dancy v. United States,* 745 A.2d 259, 266 (D.C.2000)). Unfortunately, no instruction was given at the end of trial explicitly cautioning the jury not to consider Lindsey's confession as evidence against Gayles, but no request or objection was made regarding such an instruction, and its omission does not rise to the level of plain error.

disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.") (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "[W]here the defendant receives potentially exculpatory information in time to use it effectively at trial, his conviction will be sustained." *Edelen, supra*, 627 A.2d at 971 (citing *Catlett v. United States*, 545 A.2d 1202, 1217 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989)).

It is clear from the record and the government concedes on appeal that it failed to make proper *Brady/Giglio* disclosures to defense counsel. The government had given the defense some *Brady* evidence prior to trial, but it became clear as the proceedings progressed that the disclosures were substantially incomplete. Each of the eyewitnesses had been treated favorably by the government in exchange for their testimony by garnering plea agreements on other charges or being paid with federal witness vouchers, but impeachment evidence on three of the four eyewitnesses was not disclosed before trial and had to be supplemented by the government as the trial progressed. The failures were the most egregious with regards to eyewitness Kevin Perry, who had to be excused twice during his testimony when defense counsel uncovered further evidence of Perry's cooperation with police officers that the government had not disclosed. Finally, the trial court delayed the proceedings for an entire day mid-trial so that the government could supplement their deficient disclosures. The court also denied defense counsel's motion for a mistrial at this time, maintaining that they would have the opportunity to question Mr. Perry about the

impeaching evidence. Four days later, Mr. Perry was recalled to the stand, and defense counsel raised the bias evidence on cross-examination.

Despite these errors, which the government concedes, we cannot find that there is a reasonable probability that the result of the proceeding would have been different if the evidence had been properly disclosed. Once defense counsel became aware that there were deficiencies in the government's disclosures, the court delayed the proceedings in order to give the government time to make its required *Brady/Giglio* disclosures. After the government returned with the evidence, defense counsel was able to make effective use of it in the cross-examination of each eyewitness. Two of the witnesses were recalled for cross-examination based on the evidence, and Mr. Perry's cross-examination occurred at the end of trial, immediately before closing arguments, presumably increasing its prominence in the jurors' minds.[9] Moreover, the trial court instructed the jury not to hold it against any of the parties that the trial had been delayed, thereby minimizing the effect that the untimely evidentiary disclosures had on the outcome of the trial.

Gayles, however, argues that because the *Brady/Giglio* evidence was not disclosed prior to trial, he was particularly prejudiced by not being able to use it in his opening statement. This is unpersuasive for two reasons. First, the fact that some of the impeachment evidence was not available prior to trial, in time for use in the opening statements, did not preclude its otherwise effective use at trial. As discussed above, Gayles took advantage of his ample opportunity to question the eye-

9. On cross-examination, Mr. Perry admitted to receiving additional payments that had not been disclosed by the government. Since this information was revealed before the jury at trial, and Gayles was therefore able to effectively use it, there was no reversible error resulting therefrom.

witnesses about their biases and to argue it in closing. Second, both the government and Lindsey's counsel argued during their opening statements that there were bias concerns regarding the eyewitnesses, and so the jury was placed on notice from the outset of the case to be aware of credibility issues. Although the government's disclosures under *Brady* and *Giglio* were originally deficient and tardily made, the impeaching evidence was provided in sufficient time for Gayles to make effective use of it at trial. Thus, we are not persuaded that there is a reasonable probability that, had the disclosures been made prior to trial, the outcome of the proceedings would have been different and we hold that there was no reversible error on these grounds.[10]

### LINDSEY AND GAYLES § 23–110 ARGUMENT

Finally, both Lindsey and Gayles argue that the trial court erred in denying their § 23–110 motion to vacate. They claim that there was exculpatory evidence which the government failed to disclose, that is, Vanessa Anderson's allegation that Ms. Hamilton could not have witnessed the crime, thereby violating *Brady, supra.*

Their motion therefore turned on Ms. Anderson's credibility regarding the substance of her allegation and that she had communicated this information to the prosecutor. The trial court, however, did not credit Ms. Anderson's testimony, and there is nothing in the record that would warrant a reversal of this determination. *See, e.g., Bouknight v. United States,* 867 A.2d 245, 251 (D.C.2005) ("Insofar as [§ 23–110] rulings rest upon findings of fact, we will not reverse the trial court's determinations if they are supported by evidence in the record. The determination of credibility is for the finder of fact, and is entitled to substantial deference." (citations omitted)). We therefore affirm the trial court's denial of the § 23–110 motion. Accordingly, for the reasons stated herein, we hold that the appellants' convictions are hereby

*Affirmed.*

---

**10.** Gayles also argues on appeal that the trial court erred in ruling out the testimony of two defense witnesses, Ray Proctor and Cherry Jones. *See* discussion, *supra,* at 829. With regard to Ray Proctor, the trial court upheld his invocation of his privilege against self-incrimination in accordance with *Carter v. United States,* 684 A.2d 331, 338 (D.C.1996) (en banc). Even if the trial court erred in not adequately encouraging the government to consider granting Mr. Proctor use immunity, as Gayles contends, there was no ensuing prejudice since the substance of Mr. Proctor's proffered testimony related to the conspiracy charge which was dismissed when the appellants' motion for judgment of acquittal was granted.

The trial court also did not err in denying Gayles' request to call Cherry Jones upon a finding that her testimony was collateral. We agree with the trial court's assessment of this witness and conclude that there was no error in barring the testimony of either of these witnesses.